2024 IL App (1st) 181491

Nos. 1-18-1491, 1-18-1818, 1-18-1819, and 1-18-1820 (consolidated)

Second Division
May 14, 2024

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 13349 |
| DUAVON SPEARS, CORNEL DAWSON, ANTWAN DAVIS, and CLIFTON LEMON, | ) ) ) ) ) | |
| | ) ) | Honorable Michael B. McHale, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendants-appellants Duavon Spears, Cornel Dawson, Antwan Davis, and Clifton Lemon and more than a dozen other men were indicted on various charges as the result of a wide-sweeping investigation into the New Life Black Souls (NLBS) street gang. The State proceeded to trial against defendants on one count of racketeering conspiracy under the Illinois Street Gang and

Nos. 1-18-1491, 1-18-1818, 1-18-1819, and 1-18-1820 (cons.)

Racketeer Influenced and Corrupt Organizations Law (RICO statute) (720 ILCS 5/ art. 33G (West 2012)) and one count of criminal drug conspiracy (720 ILCS 570/405.1 (West 2012)). Defendants were tried jointly by a single jury alongside two other men named in the same indictment, Teron Odum and Ulysses Polk.[1] The jury convicted each defendant on both counts. Each defendant was also sentenced to multiple concurrent life sentences for racketeering conspiracy, which were to run consecutively to a 40-year term for criminal drug conspiracy. We now remand the matter for further inquiry into allegations of juror misconduct and, if a new trial is not necessary, resentencing for criminal drug conspiracy.

¶ 2                                I. BACKGROUND

¶ 3                        A. Electronic Surveillance Orders

¶ 4      As part of the investigation into the NLBS, the Cook County State's Attorney's Office sought four electronic surveillance orders (ESOs) authorizing the interception of private communications pursuant to article 108B of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 108B (West 2012)). Specifically, law enforcement sought to wiretap Cornel Dawson's van and three of Dawson's cell phones. Each application was signed by then-First Assistant State's Attorney (ASA) Shauna Boliker and stated, in relevant part:

"I, Shauna Boliker, being duly sworn, deposes and says:

[ ]I am the First Assistant State's Attorney of Cook County, Illinois, and as such, I am duly designated to make this application, and I am authorized by law to investigate[,] prosecute,

---

[1]Like defendants, Odum and Polk were convicted on both counts. However, Odum passed away during the pendency of his appeal. In February 2022, we granted Polk's motion to sever his appeal from that of defendants. He now has a separate appeal before this court in case number 1-18-1933. Consequently, neither Odum nor Polk is a party to this appeal.

and participate in the prosecution of the SUBJECT OFFENSES noted below which are the subject of this application."

¶ 5    The presiding judge of the criminal division of the circuit court of Cook County granted the State's wiretap requests, as well as several subsequent requests for extensions of those wiretaps.

¶ 6    Prior to trial, defendants filed a motion to suppress the wiretap evidence, arguing that the ESO applications violated federal and Illinois law because they were not authorized by then-Cook County State's Attorney Anita Alvarez. Following a hearing, the trial court denied the motion to suppress. In ruling that the State's applications complied with article 108B of the Code, the court relied on various cases allowing an ASA to apply for a consensual overhear under article 108A of the Code (725 ILCS 5/art. 108A (West 2012)). The court also concluded that, even if the State's applications did not strictly comply with article 108B, the error would be "a technical defect and would not require suppression."

¶ 7                               B. Jury Trial

¶ 8    The case proceeded to a jury trial, which lasted more than six weeks and involved the testimony of over 100 witnesses. As such, we distill the voluminous record only to the extent necessary to resolve the issues raised on appeal.

¶ 9                          1. History of the Black Souls

¶ 10   Retired Chicago police detective John Rawski, the State's gang expert, testified regarding the history of the Black Souls. He explained that in the 1990s, Dwayne Lemon and Kevin Mitchell were the leaders of a gang known as the Impression Black Souls. At that time, the Impression Black Souls' territory spanned from Pulaski Road to Keeler Avenue (east to west) and from

Madison Street to the Eisenhower Expressway (north to south). The Impression Black Souls made money through drug sales, primarily on Wilcox and Monroe Streets.

¶ 11    Following a "rift" in the mid-1990s, some members of the Impression Black Souls broke off and formed a new faction called the New Life Black Souls. Dwayne Lemon became the first leader of the NLBS, a position he held until he was murdered in 1999 as part of a territory dispute with the Impression Black Souls.[2] Dawson, Dwyane Lemon's nephew, became the new leader of the NLBS after his uncle's death. The NLBS made money through robbery, kidnapping, extortion, and drug sales.

¶ 12                    2. Defendants' Membership and Rank in the NLBS

¶ 13    Detective Michael Lipsey, an expert in the field of narcotics law enforcement, testified to the general structure of a typical drug-dealing enterprise. He explained that the top of such an organization consisted of suppliers—those who "supply the drugs in bulk"—and overseers—those who "actually run[ ] the drug operation." Below them are managers, individuals who "oversee the people out on the street selling drugs, making sure that they're doing what they're supposed to do." Next are pack runners, who "run the packs" of drugs to the street-level dealers, who in turn actually sell the drugs to customers. Based on his investigation into the NLBS, Detective Lipsey opined that Dawson, Davis, Polk, and Odum all held some rank higher than street dealer. Lipsey did not opine on Lemon's possible rank in the gang's hierarchy.

¶ 14    Several former members and associates of the NLBS also testified to defendants' ranks within the gang. Former member Orlando Benamon testified that Dawson was the "leader" of the NLBS in the early 2000s. As the leader, Dawson gave orders to other members and meted out

---

[2]Because Dwayne Lemon has the same surname as defendant Clifton Lemon, we will refer to him by his full name. "Lemon" will refer to Clifton Lemon.

"violations" when members broke the rules. Benamon, a lower-ranking member, sold drugs on the street and acted as armed "security" for "the older guys," including Dawson, Odum, and Lemon.

¶ 15 Another former seller for the NLBS, Learies Brown, gave a handwritten statement to ASA Holly Kremin in which he identified Dawson as "the Chief of the Black Souls, meaning the head of the gang." All members had to call Dawson "Chief" out of respect. As Chief, Dawson "always g[ot] a cut of the money when a person sells his drugs." Odum was the "Commander" or second in charge. Polk was "one of the top runners for the Black Souls" and "control[led] the 4100 block of Wilcox." Spears was also a pack runner in the 4100 block of Wilcox Street. Similarly, Davis was "a top runner for the Black Souls at Monroe and Pulaski." Runners received drugs from Dawson and distributed them to the sellers. The runners would then collect money from the sellers and turn it in to Dawson. According to Learies Brown, Lemon was "associated with the Black Souls because of his brother," former Chief Dwayne Lemon.

¶ 16 Jubali Stokes testified that he sold drugs for the NLBS in 2002. At that time, Dawson was the Chief, and Davis, Odum, Polk, and Lemon were also all members.

¶ 17 Alex Williams, who was a paid confidential informant in the investigation, testified that he became friends with Dawson in 1994 when they met in the Cook County jail. At that time, Dawson was in the Black Souls but was not a ranking member. When Williams was released from prison in 2002, he reunited with Dawson and learned that he was now Chief of a new faction called the New Life Black Souls. Through Dawson, Williams met many other members of the NLBS such as Odum, Davis, Polk, and Lemon. As the highest-ranking members, Dawson and Odum would "oversee[ ]" the "little guys out there selling drugs" and "mak[e] sure the block was getting ran like it [was] supposed to get ran."

¶ 18   Williams was arrested in 2004 and returned to prison. Upon his release in 2011, Williams again reconnected with Dawson, who was still Chief of the NLBS. From 2011 on, Williams spent much of his time with Dawson in NLBS territory, often in the parking lot of Baba's Restaurant, a popular NLBS hangout and meeting place located at Pulaski Road and Monroe Street. Williams testified that Odum, Polk, Davis, Lemon, and other NLBS associates also frequented the area from 2011 to 2013.

¶ 19   During his time with the NLBS, Williams observed members selling drugs on Monroe Street and Pulaski Road and saw Dawson collect money from them. Odum, Davis, and Polk also passed out drugs to sellers and collected money from them. Williams saw Lemon in the area during this time but did not see him actively participate in the drug trade. Williams testified that Lemon would "[j]ust basically be around." Additionally, Odum and Spears supplied Williams with marijuana and allowed him to sell it in NLBS territory in exchange for some of the profits.

¶ 20   Deandre Pierce testified that he sold heroin for the NLBS off and on from 2011 to 2013. In a written statement taken by ASA Daniel Hanichak, Pierce stated that Dawson was Chief, meaning the "leader of all the Black Souls in the area." Dawson "r[an] that area," and "everyone answer[ed] to [him]." Dawson supervised the drug sales, and only the "higher ups" in the gang were allowed to speak directly to him. According to Pierce, Rickey Ceasar, an NLBS pack runner, was "the lowest level guy of the Black Souls on the block who c[ould] talk to [Dawson]." Odum was "the manager above" Ceasar, and Lemon was "also a manager type." Pierce would often see Lemon "watch[ing] over 4000 West Monroe and 4100 West Wilcox" and "supervising like a boss." Lemon was allowed to speak to Dawson.

¶ 21                          3. "Predicate Activity" Murders

¶ 22 The State also presented evidence that the NLBS were connected to the murders of Claude Snulligan and Johnny Taylor, both of whom were killed after the RICO statute took effect in June 2012.

¶ 23 a. Murder of Claude Snulligan

¶ 24 The evidence showed that Claude Snulligan had openly complained about the NLBS selling drugs outside his house in the 4000 block of West Monroe Street. On April 3, 2012, Odum and two other men confronted Snulligan at his home and accused him of calling the police on them. Odum insisted that Snulligan "make it up [to him] by selling drugs for [him]." When Snulligan refused, Odum and the others beat Snulligan with a handgun and robbed him. They also attempted to force Snulligan into the trunk of a car, but Snulligan successfully resisted.

¶ 25 Odum was later arrested for the attack. Shortly thereafter, Dawson—whom Snulligan described as the "leader" of the NLBS—offered to return Snulligan's stolen property, pay him $3000, and "not mess with him anymore" in exchange for Snulligan not cooperating in the case against Odum. Davis also called Snulligan around this time and encouraged him to visit Odum's lawyer and sign an affidavit recanting his allegations against Odum. Snulligan did not accept Dawson's offer or sign the affidavit. Instead, he reported those conversations to the police.

¶ 26 Lawrence Hale testified that on October 20, 2012, he and Snulligan went to a cell phone store near Baba's Restaurant on Madison Street and Pulaski Road. Hale talked to some friends in the parking lot while Snulligan went inside. As Snulligan exited the store, Hale heard a gunshot and watched Snulligan fall to the ground. Hale saw the shooter fleeing the area from behind Snulligan but could not see his face. Hale described the suspect as a black man with dreadlocks who was wearing a gray hoodie with the hood pulled over his head.

¶ 27    Learies Brown testified that he heard the gunshot and walked over to see that Snulligan had been shot in the head. At trial, Brown denied seeing the actual shooting or telling the police that Spears was the shooter. However, Detective Greg Swiderek testified that Brown gave a different account in an interview on March 1, 2013. According to Detective Swiderek, Brown stated that he saw Spears emerge from an alley off Madison Street and shoot Snulligan in the back of the head. Spears was wearing a gray hoodie, which he pulled over his head just before pulling the trigger. Spears then fled southbound on Pulaski Road toward Monroe Street.

¶ 28    Brown also gave a written statement during a March 3, 2013, interview with ASA Kremin. According to the statement, Brown told ASA Kremin that he saw Spears emerge from the alley just as Snulligan exited the cell phone store. Spears was wearing a gray hoodie and had a "ponytail and dreads." Spears pulled his hood over his head, shot Snulligan once in the back of the head, and ran southbound on Pulaski Road.

¶ 29    Alex Williams testified that he was looking for a parking spot by Baba's Restaurant around the time Snulligan was murdered. As Williams drove around, he saw many NLBS members in the area, including Spears, Davis, and Polk. Williams viewed security footage in court and identified all three around the parking lot on the day of the murder.

¶ 30    On November 28, 2012, Williams secretly recorded a conversation with Dawson. Therein, Williams brings up Spears's name and states that he (Williams) was "on Madison" and "saw the whole demo." Williams testified that he meant he had witnessed Snulligan's murder. Dawson responds that the "mark" was:

> "[s]ay[ing] he beat him, beat him with a pistol and all this old shit. You know what I'm saying? So I go to the lawyer's office, this lawyer's office, he laid it out for me. This my guy hospital pictures, where his eye is black, brace neck on, shit, you feel where I'm

coming from? I'm like, what? And now he got charges on top of charges. He got a battery, kidnapping, attempt to kidnap."

¶ 31    Dawson goes on to state that Odum was "feeling good now," which Williams understood to mean that he was happy he would escape charges now that Snulligan was dead. Dawson then says, "It's over with for real. But man, motherfucker supposed to know man." Williams testified that he understood this to mean that Snulligan should have known "not to snitch" on Odum.

¶ 32    Dawson later mentions his attempts to dissuade Snulligan from incriminating Odum, saying, "I offered him 4,000" to "go down there, holler at my man, give him your John Hancock, let him record you." Williams testified that he understood Dawson to mean that he wanted Snulligan to sign an exculpatory statement for Odum's lawyer.

¶ 33    However, Dawson states that Snulligan declined the offer and was not seen for several months. Dawson then says that he later saw Snulligan again and told his "brother" to "get [him] the banger." Williams testified that Dawson meant that he had asked Polk to hand him a gun, presumably to get revenge on Snulligan.[3] Dawson describes how he and Polk followed Snulligan but soon saw police in the area, which caused Dawson to wonder, "[I]s this mark trying to set us up? You feel me, why would he even come through the neighborhood like this?"

¶ 34    That same day, Williams also recorded a separate conversation between himself and Polk. In that conversation, Williams brings up Spears, and Polk says that he was "right there" when "that shit happened," which Williams understood to mean that he was present when Snulligan was murdered. Williams states that "it was real quick too." Polk responds, "That how shit work, man,"

---

[3]The evidence showed that Dawson and Polk are half-brothers.

which Williams took to mean that Snulligan was murdered in retaliation for snitching on defendant Odum.

¶ 35    In a third recorded conversation, this time occurring on December 12, 2012, Williams tells Davis that he saw him, Polk, Spears, and other NLBS members in the area before Snulligan's murder. Davis responds that they were "[a]ll at work," which Williams understood to mean that they were involved in planning the shooting. Davis also states that Spears was a "two stars homie" for his actions, which Williams testified meant that he "did a good job by killing Snulligan."

¶ 36                           b. Murder of Johnny Taylor

¶ 37    The State also presented evidence that unidentified junior members of the NLBS shot and killed Johnny Taylor, an aspiring rapper who was on the verge of signing a record deal with Atlanta Records. The State's theory was that Taylor, a member of the New Breeds street gang, was killed in retaliation for the earlier shooting of Darvelle Brown, who was killed while selling drugs for the NLBS.

¶ 38    Marquette Robinson testified that he saw Taylor standing near an alley on South Springfield Avenue just before midnight on January 9, 2013. Robinson briefly greeted Taylor and continued on his way. Robinson then heard multiple gunshots and ran away. When he returned to the area, he saw that Taylor had been shot.

¶ 39    Detective Daniel Jensen was assigned to investigate Taylor's murder. Detective Jensen viewed surveillance footage from a building near the alley where Taylor was killed. However, the cameras did not capture the shooting itself, and the police were unable to ascertain the identity of anyone on the videos. Nevertheless, the footage was taken into police custody.

¶ 40    Williams recorded a conversation he had with Dawson and Davis on the day following Taylor's murder. Therein, Davis approaches Dawson and tells him that "the little n*** they killed

was a rapper. Supposed to get his signing bonus tomorrow. Seventy-five thousand." Davis then explains that his girlfriend, an employee of "CTA Housing," informed him that "the cops just came and got the tapes." According to Davis, the police suspected that the victim was killed in an attempted robbery because the killers thought "he already had the [bonus] check."

¶ 41 Davis—presumably based on what he heard from his girlfriend—goes on to say that the footage did not show the shooters' faces when "they came down the alley" because "they got on hoodies and shit." However, the "front cameras" caught the shooters' faces as they left the area. Davis then speculates that the police "finna go blow the faces up. Blow the tape up" to identify the shooters. Dawson instructs Davis to "[g]o tell them they need to go sit down." Williams testified that he understood Dawson to mean that the shooters needed to "get out of sight" to avoid police attention. Dawson also later states, "They better go sit the fuck down. Take a nap. Everybody," which Williams understood to mean that all NLBS members should lie low while the police investigated the shooting.

¶ 42 Approximately a week later, on January 18, 2013, Williams recorded another conversation with Dawson and Davis. In this conversation, Davis states, "[T]hat little boy had his funeral." Defendant Dawson asks, "What little boy?," and defendant Davis replies, "On Wilcox."[4] Williams testified that he understood this as referring to "[t]he rapper that got killed on Springfield and Wilcox." Dawson continues, "[T]hem n*** nuts. They went to the man's funeral" and were currently "over there on the corner with the obituary." Davis adds, "So they family won't get suspicious." Williams states, "Yeah, fuck you up and pay your respects." Davis replies, "For cops

[4]As maps submitted into evidence show, South Springfield Avenue intersects with West Wilcox Street.

and shit." Williams testified that they were talking about "kill[ing] somebody and show[ing] up at they funeral and act[ing] like you ain't had shit to do with it."

¶ 43                                    4. Other Murders

¶ 44     The State also presented evidence of other murders that occurred prior to the effective date of the RICO statute.

¶ 45                                a. Murder of Charles Watson

¶ 46     Jubali Stokes testified that he and Charles Watson sold drugs for Stokes's uncle, NLBS member William "Chuck" Redfield. In June 2002, Redfield summoned Stokes and Watson to his house and accused them of stealing money and drugs from the gang. Redfield and two other men beat them with sticks, tied them up with duct tape, and forced them into a van. Stokes and Watson were then driven to an abandoned building at Monroe Street and Pulaski Road.

¶ 47     Stokes was taken to the basement, where Dawson and Lemon were waiting for him. Stokes also saw Redfield and Donald Hughes in the basement at some point. Watson was taken upstairs for interrogation, where Stokes could hear him screaming. Stokes was eventually released after it was determined that he had not stolen anything. He was treated at the hospital for injuries sustained during the beating at Redfield's house. However, Stokes never saw Watson again.

¶ 48     Hughes, a former NLBS member, testified that he was on the street selling heroin for the gang when he observed Redfield's van pull up. Redfield got out and talked to Dawson and Lemon for a few minutes before leaving. After Redfield left, Dawson instructed Hughes to remove some drugs that were stashed in the abandoned building. Hughes retrieved the drugs and hid them in a vacant lot across the street. When Redfield returned to the area sometime later, he and others dragged Stokes out of the van and into the abandoned building. Hughes followed them inside, where he saw Dawson and Lemon waiting in the basement.

¶ 49    Later, Dawson and Lemon handed Hughes a shovel and instructed him to help a man named Shaw dig a hole next to the abandoned building. Hughes and Shaw began digging but disbanded when someone yelled that the police were coming. When Hughes returned to the area, Redfield, Shaw, and another man were throwing dirt over a body that had been placed in the hole.

¶ 50    At some point, a severely injured Stokes came "crawling" out of the basement of the abandoned building. Hughes helped load him in a car and took him to the hospital. With the help of a cadaver dog, police later found Watson's body buried next to the abandoned building, consistent with Hughes's testimony. Hughes was arrested and pled guilty to concealing a homicide.

¶ 51    Retired detective Patrick O'Donovan testified that he was assigned to investigate Snulligan's murder in October 2012. Part of his role in the investigation was to monitor the wiretap that had been placed in Dawson's van. On June 3, 2013, Detective O'Donovan was patrolling around Monroe Street and Pulaski Road when the van drove by. Detective O'Donovan decided to "tickle the wire," meaning to "make contact with the person who is the subject of the wire[ ] and see if we can stir any conversation." Detective O'Donovan and his partner initiated a traffic stop and asked Dawson if he was "involved with the guy that was killed and buried in the back yard over on Monroe Street?" Dawson did not give a direct answer but just "sort of laugh[ed] and *** play[ed] along." After the stop ended, Dawson was captured on the wiretap asking, "[H]e's talkin' about Charles, ain't he?"

¶ 52                        b. Murder of Earnest Keys

¶ 53    Orlando Benamon testified that he joined the NLBS as a teenager in 2002. On July 25, 2003, he attended a gang meeting in Garfield Park with Dawson, Odum, and Davis. After the meeting, Benamon drove back to NLBS territory with Dawson and Odum. Along the way, Dawson

pointed out a Chevy Impala he claimed was being driven by "Block," a member of a rival gang. The Impala then sped away.

¶ 54    Dawson instructed Benamon to "knock his shit down" if the Impala came back, which Benamon understood as an order to kill the driver of the Impala. Benamon got out of the car and waited for the Impala at the corner of Pulaski Road and Monroe Street. As the Impala reappeared in the area, Dawson drove by and nodded to Benamon to signal that "that was the guy." When the Impala stopped at a stop sign, Benamon shot and killed the driver with a gun that Dawson had given him. Dawson threatened to kill Benamon or one of his family members if he talked to the police about the shooting. The driver of the Impala was later identified as Earnest Keys.[5]

¶ 55                                    5. Drug Evidence

¶ 56                                a. Undercover Drug Buys

¶ 57    The State presented evidence of nearly two dozen separate undercover drug buys executed in NLBS territory from April 2013 to June 2013. In addition to the testimony of the various officers involved, the jury also heard and saw videos from many of the buys that were recorded pursuant to consensual overhear orders.

¶ 58                                b. Williams Recordings

¶ 59    Several of the conversations recorded by Williams also mentioned the NLBS's drug business. For example, in a conversation recorded on November 28, 2012, Dawson tells Williams that "the last dope I had them people said man this shit ain't nothing." Dawson explains that he "shook up a gram" from a new batch of drugs and "gave it to a few motherfuckers and they was like goddamn." He then adds, "I'm gonna throw another pill on this shit. *** It should be a

_____

[5]The evidence also showed that Earnest Keys was murdered in a tragic case of mistaken identity. He was not the rival gang member Dawson thought he was.

thousand dollars. Like, that hour." Williams testified that Dawson meant that his new drugs were high quality and that he was going to make a lot of money on them after cutting them with pills called "dorms." Dawson also mentions several times that he planned to "do a little P-O" with the new drugs, which Williams testified meant that he was going to "pass out some free bags of heroin" for customers to sample.

¶ 60     In another conversation recorded on December 11, 2012, Williams tells Polk that he knew some people who "want[ed] to hustle and all that." Polk responds that he "really needed somebody out here at night" because he only had "like two workers." Williams asks, "What the jabs consist of?," to which Polk answers, "[I]t's fourteens on the rocks." Polk continues, "You know the sawbuck rocks[. Y]ou get $40 off the motherfuckers." Williams testified that he understood this to mean Polk had 14 bags of crack cocaine and that whoever sold them would get to keep $40 of the proceeds. Polk goes on to say, "I'm going back to straight nickels. Then you get twenty-five off that jab." Williams testified that he understood Polk to mean that he would have bags of crack cocaine to sell for $5 and that the seller would keep $25 for every pack sold.

¶ 61     In a different conversation recorded on December 12, 2012, Davis tells Williams, "He gave me um—a sawbuck" and "we only got a little time frame." Williams testified this meant Dawson had given Davis 10 grams of heroin that he needed to sell quickly. Davis continues, "Yeah, we gonna do the two for five lick," which Williams testified meant selling two bags of heroin (which would normally cost $10) for just $5. Davis then states, "I'm a try to at least sack up—'cause he ain't want much back off the shit so. Try to sack up like a nickel that way we halves on the split." He adds, "And high pays on the jabs for the workers. *** That two fives should take off on they ass. *** We'll just split the profits." Williams testified that he understood Davis to mean that he

could sell the discounted heroin quickly and still make a profit because Dawson did not expect much money in return.

¶ 62                                c. Search of 4039 West Monroe Street

¶ 63    On March 29, 2013, police officers executed a search warrant for the apartment building located at 4039 West Monroe Street. Prior to executing the warrant, officers surveilled the area and observed NLBS member Corey Tagle selling crack cocaine to multiple customers. Police arrested the fourth such customer and recovered two plastic bags of crack cocaine with green dollar signs printed on them.

¶ 64    As officers approached the apartment building to execute the warrant, they observed another NLBS member, Frank Wynne, run up the stairs. The officers pursued Wynne into a second-floor apartment, where they watched him throw a towel onto the floor. Officers arrested Wynne and recovered several packages of suspect narcotics that were wrapped in the towel. In total, officers recovered 38 bags of suspected heroin and 184 bags of suspected crack cocaine. The bags later tested positive for an aggregate of 17.8 grams of cocaine.

¶ 65                                d. Briel Elverton

¶ 66    The State also presented wiretap evidence that from around 7:45 p.m. to 8:15 p.m. on May 30, 2013, Dawson had several phone conversations with an unidentified male and, separately and on a different phone, Briel Elverton. In these calls, Dawson arranges for Elverton to go to a place "by Frank's" and pick up "twenty-seven or some shit like that" in exchange for an unintelligible amount of "dollars." Elverton calls Dawson again at approximately 8:30 p.m. and tells him that he made the pickup and is about to get on the expressway.

¶ 67    Sergeant Charles Daly testified that he and his partner, Detective Michael Dyra, received information about this "possible narcotics transaction" from officers monitoring the Dawson

wiretaps. Sergeant Daly and Detective Dyra located Elverton's van and initiated a traffic stop. While Detective Dyra talked to Elverton, Sergeant Daly surreptitiously recovered a package containing 26.6 grams of heroin that was hidden inside Elverton's gas cap.

¶ 68    Around 8:40 p.m., Elverton calls Dawson to report that he had been stopped by the police. Elverton states that the police searched his van but did not find the drugs because he had "stowed that shit *** [i]n the tank." Dawson responds it was "a blessing" and to "come on home."

¶ 69    Pole camera footage showed Elverton arriving at Dawson's house shortly thereafter. Dawson and Elverton look around the van. Afterwards, Dawson is seen making a phone call, which the wiretap showed was to the same unidentified male as before. The unidentified male tells Dawson that he would call someone to "make sure he cool" and then would "hit [Dawson] right back." When the unidentified male calls back a few minutes later, he tells Dawson that the person he spoke to said that Elverton picked up the package and "stuff[ed] it in the gas tank." Dawson surmises that the police must have been watching them.

¶ 70                                e. Rickey Ceasar

¶ 71    Additional wiretap evidence showed that on June 3, 2013, Rickey Ceasar called Dawson and stated that he "had to flush the shit" because the police were trying to knock his door down. Dawson instructs Ceasar to "shut up, turn everything off and don't say shit and keep the doors locked. Don't serve anybody."

¶ 72    The following day, undercover officers observed Ceasar participate in multiple hand-to-hand transactions in the 4000 block of West Monroe Street. In one instance, they observed Ceasar retrieve "a large bundle" of money from someone through a basement window and deliver it to the driver of a maroon van. When officers subsequently pulled the van over, they discovered that Odum was the driver and that Polk and Lemon were passengers.

¶ 73    Later that day, Ceasar was arrested outside Baba's Restaurant in possession of 48 plastic Baggies containing a total of 17.3 grams of heroin. However, he was released within several hours. Upon his release, Ceasar called Dawson and explained what happened. In the call, Dawson insinuates that the police would only have released Ceasar so quickly if he was cooperating with them. Ceasar denies telling the police anything, but Dawson remains skeptical. Dawson ends the conversation by telling Ceasar, "[Y]ou sit down for a minute and I'm gonna come holler at ya." Dawson then calls an unidentified male and asks him about Ceasar's arrest. After the unidentified male corroborates Ceasar's story, Dawson tells him, "[Y]ou all just chill for the night. Will start fresh in the morning."

¶ 74                                f. Bobby Scott

¶ 75    Officer Marcus Myles testified that between May 6 and June 5, 2013, he made five undercover purchases of heroin from the building at 4134 West Wilcox Street. On three of these occasions, Bobby Scott was one of the individuals who sold Officer Myles the heroin.

¶ 76    Officer Gerold Lee testified that he and other officers went to 4134 West Wilcox Street to execute an arrest warrant for Scott on June 13, 2013. Officers gained entry to Scott's apartment, but he was not home. However, police recovered 263.4 grams of heroin that was in a bag next to a "cutting agent" on the living room coffee table. Scott was later arrested by different officers.

¶ 77                               g. Defendants' Arrests

¶ 78    Dawson, Odum, Polk, and Clifton Lemon were ultimately arrested in the early morning hours of June 13, 2013, after the execution of separate warrants at their respective homes.

¶ 79    Detective David Greenwood testified that he was part of the team that arrested Dawson. The arresting officers found 7.3 grams of heroin in Dawson's freezer, as well as an empty bottle of Dormin and empty Dormin capsules in his kitchen trash can. Detective Greenwood explained

that Dormin were pills used as "a common cutting agent for narcotics." Elsewhere in Dawson's home, police also found "other narcotics paraphernalia," including a digital scale; numerous plastic Baggies; and a box that contained a sifter, scissors, brush, spoon, a measuring spoon, and multiple bottles of Dormin.

¶ 80    Officer Kevin Kilroy testified that he participated in Polk's arrest. Officer Kilroy recovered plastic Baggies, a grinder, and Dormin from a bag in a bedroom closet. Another member of the search team, Sergeant Jose Lopez, found $1900 in cash, a digital scale, additional Baggies, and 48.6 grams of crack cocaine.

¶ 81    Detective Albert Wyroba testified that he participated in the arrest of Lemon. Police recovered a grinder, two digital scales, numerous plastic Baggies, and $910 in cash from Lemon's apartment.

¶ 82    Detective George Lopez testified that he and other officers executed the arrest warrant for Odum. The officers found a scale, marijuana, small Baggies, and $3718 in cash in Odum's apartment.

¶ 83    Officer Angela Pittman testified that on October 24, 2012, she purchased two bags of crack cocaine from Spears as part of an undercover operation. After the sale, Spears was arrested in the 4100 block of West Wilcox Street by Officer Scott Hall.

¶ 84    After the State concluded its case-in-chief, all defendants rested without presenting evidence.

¶ 85                              C. Jury Deliberations

¶ 86                              1. Initial Jury Notes

¶ 87    On November 30, 2017, the third day of deliberations, the trial court received a note from jurors 120 (the foreperson) and 40 raising concerns about potential misconduct. Specifically, the note stated that (1) juror 28 revealed that her father and brother were members of the Black Souls, (2) jurors 215 and 44 made statements to the effect that they were "only here to send a message," and (3) juror 143 had been "racially bullying and ha[d] shown male chauvinism." Jurors 120 and 40 stated that they "d[id] not want to continue under these circumstances" and predicted that "there will be a hung jury" if the court did not address the issues.

¶ 88    Before the court could respond, juror 120 sent another note, this time seeking "clarification" as to whether "a death that occurred in 2002 [could] be considered as a predicate activity for racketeering." The court set this second note aside, stating, "We can deal with that after we get past the big first one."

¶ 89                                              a. Juror 28

¶ 90    The court proceeded to question juror 120 about her first note. She confirmed that juror 28 stated her father and brother were members of the Black Souls. The court then brought out juror 28, who denied the allegation. She explained that she mentioned the Black Souls in deliberations only to illustrate the point that, "if my father is a Black Soul, that doesn't make me a Black Soul." However, juror 28 also revealed to the court that her brothers were members of a different gang, the Vice Lords. The State moved to remove juror 28 for being untruthful on her jury questionnaire, specifically when she answered no to the question, "Has any member of your immediate family or very close friend ever been involved in a gang?" The court removed juror 28 over defendants' objections and instructed the jury to stop deliberating.

¶ 91                                              b. Juror 215

¶ 92     The court next recalled juror 120 to inquire about her allegations against juror 215. Juror 120 could not recall juror 215's exact words but confirmed that he said something like that "he was going to send a message." The court questioned juror 215, who admitted to saying something about "sending a message." However, juror 215 also assured the court that he could apply the evidence to the law and be fair to both sides. The court did not remove juror 215 from the jury.

¶ 93                                    c. Juror 143

¶ 94     The court then questioned juror 120 about her allegations of "racial bullying" and "male chauvinism" against juror 143. Juror 120 stated that juror 143 had "consistently been making racial comments" directed at the defendants and other jurors. The court immediately removed juror 143 without questioning him, explaining that it found juror 120's allegations credible and that it would not believe juror 143's denial because he had "been a terribly high-maintenance juror" who had made it "very clear he doesn't want to be here."

¶ 95                                    d. Juror 44

¶ 96     Finally, the court inquired into the allegation that juror 44 also mentioned "sending a message" in deliberations. Juror 120 did not remember his exact words but stated that the comments were "not racial" and "basically insinuat[ed] the same goal in trying to send a message." Juror 44 denied saying anything about sending a message but confirmed that he could be fair to all parties and apply the evidence to the law. He was not removed from the jury. Two alternates were called in to replace jurors 28 and 143.

¶ 97                                    e. Juror 34

¶ 98     Later that afternoon, before the new jury could be constituted, juror 34 passed out from a medical event and was taken to the hospital via ambulance. The court excused her *sua sponte* and called in another alternate.

¶ 99                                      2. Subsequent Jury Notes

¶ 100   Around the time juror 34 lost consciousness, the court received another note from jurors 120 and 40, which read, "Juror No. 40 would like to know your response on her request of being removed from the jury." After consulting with the parties, the court responded that no such request had been made. Jurors 120 and 40 then sent another note, which read:

> "Juror 40 and 120 would like to be removed due to a letter received earlier today. With the instructions given to us in part of completing our civic duty, we personally feel the instructions are structured in a style to come to one verdict, and we can't complete our civic duty due to that."

The court removed jurors 120 and 40 *sua sponte* without further questioning, explaining that the note's reference to the jury instructions made it "obvious to this Court that what they are saying is [they] cannot follow the law."

¶ 101   Counsel for Spears objected, asking that jurors 120 and 40 "be voir dired at least." Following a recess, the State also requested *voir dire*, commenting that it would be "imprudent" to excuse jurors 120 and 40 without further questioning. However, the court denied the requests for further *voir dire*. The court informed the jury that they now "constitute[d] a new jury" and would "need to start over with deliberations *** from square one."

¶ 102                                      D. The Verdicts

¶ 103   On December 2, 2017, after three days of deliberations, the newly formed jury found all defendants guilty of racketeering conspiracy and criminal drug conspiracy. As to each defendant, the jury found that the murders of Snulligan and Taylor formed part of the pattern of predicate activity underlying the racketeering conspiracy. The jury also found that the following unlawful deaths were reasonably foreseeable to each respective defendant and occurred while that defendant

was engaged in the racketeering conspiracy: for Dawson, the deaths of Watson, Keys, Snulligan, and Taylor; for Spears, the death of Snulligan; for Davis, the deaths of Snulligan and Taylor; and for Lemon, the death of Watson.

¶ 104   With respect to the count of criminal drug conspiracy, the jury found the following acts were proven to have been committed by a coconspirator in furtherance of the conspiracy: (1) the possession of 17.8 grams of cocaine with the intent to deliver by Wynne on March 29, 2013; (2) the possession of 26.6 grams of heroin with the intent to deliver by Dawson and Elverton on May 30, 2013; (3) the possession of 17.3 grams of heroin with the intent to deliver by Ceasar on June 4, 2013; (4) the possession of 7.3 grams of heroin with the intent to deliver by Dawson on June 13, 2013; (5) the possession of 263.4 grams of heroin with the intent to deliver by Scott on June 13, 2013; and (6) the possession of 48.6 grams of cocaine with the intent to deliver by Polk on June 13, 2013.

¶ 105   After the verdicts were read and the jury was polled, the State made an oral motion to bar the parties from contacting any member of the venire without leave of court. The court granted the motion.

¶ 106                     E. Motion to Interview Juror 40

¶ 107   On April 6, 2018, defendants jointly presented a "Motion for Leave of Court to Obtain a Sworn Affidavit of Juror [40] for Purpose[s] of Evaluating Factual Assertions of Racial Bias."[6] Attached to the motion was an affidavit from Davis's sister, Shira Davis. According to the affidavit, Shira reached out to State Representative La Shawn K. Ford after the trial to voice her opinion that the RICO statute was "an unfair law." Representative Ford informed Shira that he

---

[6]The motion erroneously identified juror 40 as juror 38. There is no dispute that the motion related to juror 40.

knew juror 40, a Black woman, and that juror 40 "felt the jury deliberations process was very unfair." After learning juror 40's identity from Representative Ford, Shira was able to contact her online because juror 40 was "a community activist with a high-profile Internet presence."

¶ 108   After communicating on Facebook, juror 40 gave Shira her phone number and asked to speak to her about the case. According to the affidavit, juror 40 told Shira over the phone that, before she was removed, the jury was split nine (whom juror 40 referred to as "they") to three (whom juror 40 referred to as "us"). Juror 40 also described how some of "the[m]" were "jumping on tables" and "throwing chairs." Shira asked whether "there was a lot of racism going on," and juror 40 replied "yes." When asked specifically whether " 'they' were calling you the 'n word,' " juror 40 answered, "yes, they were calling us every name but the child of God." Juror 40 also told Shira that she was willing to speak to the defense. However, juror 40 did not provide an affidavit.

¶ 109   The court denied defendants' motion, citing the "no impeachment" rule. In so ruling, the court acknowledged that *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017), cited by defendants, established a limited exception to the no impeachment rule where there is a clear indication that a defendant was convicted based on racial animus. However, the trial court distinguished *Pena-Rodriguez* on the basis that (1) juror 40 was not on the jury that ultimately convicted defendants and (2) her claims fell short of the detailed allegations suggesting that the verdict was racially motivated in *Pena-Rodriguez.* The court also noted that juror 120 was "extremely diligent in reporting any perceived improprieties" and only raised concerns of racial bias from juror 143, who was immediately removed. The court further stated that it did not find juror 40 credible because she had "twice violated her oath to follow the law" even if she disagreed with it.

¶ 110   About a month later, on May 18, 2018, counsel for Dawson informed the court that juror 40 had approached him at the courthouse that day and asked to speak to him. Counsel requested

permission to interview juror 40, who was apparently still present. The court denied the request, reiterating that she lacked credibility.

¶ 111                     F. Defendants' Motions for a New Trial

¶ 112    During the same hearing, the court also heard arguments on defendants' motions for a new trial, including the argument that the court erred in removing jurors 120 and 40. In denying the motions, the court stated that the final note from jurors 120 and 40 was "indeed unequivocal that they were not going to follow the law" and "left no room for doubt" that they were "placing their personal disagreement with the jury instructions over their oath to follow the law." The court added that it "had no confidence whatsoever in any attempt to rehabilitate them" by ordering them to follow the instructions they thought were unfair.

¶ 113    The court also addressed defendants' argument that the wiretap evidence should have been suppressed because the ESO applications were not signed by State's Attorney Alvarez. The court reiterated its earlier finding that the lack of State's Attorney approval was merely a "technical defect" that did not require suppression. The court acknowledged that, since its original ruling, the Second District reached the opposite conclusion in *People v. Allard*, 2018 IL App (2d) 160927, but stated that it "did not feel bound" by *Allard* because it was decided after the verdict in this case. In any event, the court opined that any error was harmless "given the enormous amount of incriminating evidence that would remain if [the ESO] evidence was eliminated."

¶ 114                     G. Sentencing

¶ 115    The case proceeded to a sentencing hearing on June 1, 2018. There, the State argued that section 33G-5(a) of the RICO statute (720 ILCS 5/33G-5(a) (West 2012)) required that each defendant receive a mandatory life sentence because the jury found that defendants engaged in a pattern of predicate activity that included the murders of Snulligan and Taylor. The State further

argued that the court should impose additional life sentences for the other murders that the jury found were reasonably foreseeable to each defendant and occurred while that defendant was engaged in the racketeering conspiracy. Finally, the State maintained that the court should impose an additional consecutive sentence of 9 to 40 years for criminal drug conspiracy because the jury found that the conspiracy included an agreement to possess over 100 grams of heroin with the intent to deliver.

¶ 116    Defendants generally argued that they were not eligible for life sentences for racketeering conspiracy. They also contended that the rule of lenity required that the "additional" sentences imposed for the reasonably foreseeable deaths be concurrent, rather than consecutive, to any sentence for racketeering conspiracy. Lastly, defendants argued that the count of criminal drug conspiracy should merge into the racketeering conspiracy because the drug crimes were part of the racketeering conspiracy.

¶ 117    After arguments in aggravation and mitigation, the court sentenced each defendant to natural life in prison for racketeering conspiracy based on the predicate murders of Snulligan and Taylor. For each defendant, the court also imposed a term of 40 years in prison for criminal drug conspiracy, which was to run consecutively to the life sentence. Finally, the court sentenced each defendant to additional life sentences for the deaths the jury determined were reasonably foreseeable to him, *i.e.*, four additional life sentences for Dawson, two for Davis, and one for Lemon. These additional life sentences were to be served concurrently to the life sentence for racketeering conspiracy. The court denied each defendant's motion to reconsider his sentence.

¶ 118    This appeal followed.

¶ 119                                  II. ANALYSIS

¶ 120                              A. Right to Unanimous Jury

¶ 121                                    1. Dismissal of Jurors 120 and 40

¶ 122   On appeal, defendants first argue that they were denied their rights to a fair trial and a unanimous jury when the trial court dismissed jurors 120 and 40 after deliberations had begun.

¶ 123   Generally, matters of jury selection and management are within the sound discretion of the trial court. *People v. Roberts*, 214 Ill. 2d 106, 121 (2005). This discretion extends to the decision on whether to replace a juror, even after deliberations have begun. *Id.* Our supreme court has stated that the "primary consideration" in determining whether a trial court has abused its discretion in this area is the potential prejudice to the defendant. *Id.* In evaluating the prejudicial impact of a juror's dismissal, a court should consider the totality of the circumstances, including

> "(1) whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case; (2) whether the original jurors had formed opinions about the case in the absence of the alternate juror; (3) whether the reconstituted jury was instructed to begin deliberations anew; (4) whether there is any indication that the jury failed to follow the court's instructions; and (5) the length of deliberations both before and after the substitution." *Id.* at 124.

¶ 124   Additionally, both the Illinois and United States Constitutions guarantee a criminal defendant the right to have his case decided by the unanimous verdict of 12 impartial jurors. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 13; *People v. Strain*, 194 Ill. 2d 467, 475 (2000). Of course, the right to a unanimous jury would be rendered illusory if jurors could be removed simply because they were not swayed by the State's evidence. *United States v. Litwin*, 972 F.3d 1155, 1169 (9th Cir. 2020). "A discharge of this kind would enable the government to obtain a conviction even though a member of the jury that began deliberations thought that the government had failed to prove its case." *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987). And a defendant

clearly suffers prejudice if a juror who would have voted to acquit him was removed from the jury. Thus, a trial court's discretion to remove a juror is limited where the reason for removal stems from the juror's doubts about the sufficiency of the evidence. *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999).

¶ 125    However, a trial court "faces special challenges" when attempting to determine whether a juror's request for dismissal stems from that juror's views on the merits of the case. *Id.* at 1086. The reasons underlying the juror's request will often be unclear, and "a court may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations." *Brown*, 823 F.2d at 596. The sanctity of secret deliberations is not a matter to be taken lightly. "It is beyond question that the secrecy of deliberations is critical to the success of the jury system." *United States v. Boone*, 458 F.3d 321, 329 (3rd Cir. 2006). Secrecy protects the jury from improper influences, facilitates free and open discussion among jurors, and limits public scrutiny that might otherwise undermine the integrity of the deliberative process. *Symington*, 195 F.3d at 1086. On the other hand, a defendant's right to a unanimous verdict from an impartial jury remains a fundamental constitutional right. *People v. Jackson*, 2022 IL 127256, ¶¶ 51, 63.

¶ 126    Recognizing this predicament, the D.C. Circuit Court of Appeals in *Brown* held that, "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Brown*, 823 F.2d at 596. The court opined that "[a]ny other holding would fail to protect adequately a defendant's right to be convicted only by a unanimous jury." *Id.* Citing *Brown*, several federal courts have adopted a similar standard, typically clarifying that there must not be any *reasonable* possibility that the juror's opinion of the evidence is the basis for dismissal. See, *e.g.*, *United States v. Kemp*, 500 F.3d 257, 303 (3d Cir. 2007); *Symington*, 195 F.3d at 1087; *United States v. Thomas*,

116 F.3d 606, 622 (2d Cir. 1997). In *Symington*, for example, the Ninth Circuit articulated the standard as follows: "[I]f the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." (Emphasis in original) *Symington*, 195 F.3d at 1087. In such a case, the trial court must either instruct the jury to continue deliberating or declare a mistrial. *Id.* As in *Brown*, the *Symington* court concluded that this standard struck the proper balance between the "twin imperatives" of maintaining jury secrecy and effectuating a defendant's right to a unanimous and impartial verdict. *Id.*

¶ 127   In *People v. Gallano*, 354 Ill. App. 3d 941, 954 (2004), this court adopted the standard as articulated in *Symington*, holding that, "where the record shows any reasonable possibility that the impetus for a juror's dismissal during deliberations stems from his views regarding the sufficiency of the evidence, the dismissal of that juror constitutes error." We agree with the *Gallano* court that this standard is necessary to "ensure[ ] that a defendant's constitutional right to a unanimous jury verdict is protected and guarantee[ ] that a juror will not be excused in a manner that appears to facilitate or manipulate the rendering of a guilty verdict." *Id.*

¶ 128   Accordingly, the question becomes whether there is any reasonable possibility that the impetus for dismissal of juror 120 or juror 40 arose from their views regarding the strength of the State's evidence. To that end, the State argues that the final note from jurors 120 and 40 was a clear expression that they would not follow the law because they disagreed with the "structure" of the court's instructions. Defendants, on the other hand, contend that the note was equivocal and "vacillated" as to why the jurors wished to be dismissed. More specifically, defendants acknowledge that the State's reading is one possible interpretation but maintain that the note could also be read to mean that the jury disagreed as to the meaning of the instructions or that jurors 120

and 40 simply sought a way out of what had clearly become contentious deliberations. Defendants thus conclude that there is at least a reasonable possibility that jurors 120 and 40 asked to be dismissed because they did not find the evidence sufficient to convict.

¶ 129    The text of the note in question is just two sentences and reads as follows:

> "Juror 40 and 120 would like to be removed due to a letter received earlier today. With the instructions given to us in part of completing our civic duty, we personally feel the instructions are structured in a style to come to one verdict, and we can't complete our civic duty due to that."

¶ 130    The first sentence, regarding a "letter" received earlier that day, clearly referred to the trial court's prior correspondence with the jury. As previously explained, the court received a jury note asking if it had decided on juror 40's request to be dismissed. The court responded that juror 40 had not made such a request, and predictably, the court soon received another note explicitly requesting dismissal. In the second and final sentence of the note, jurors 120 and 40 explain why they requested dismissal. They say that they "can't complete [their] civic duty" because they "personally feel that the instructions are structured in a style to come to one verdict."

¶ 131    We agree with the State (and the trial court) that the only reasonable interpretation of this statement is that jurors 120 and 40 would not follow the law as instructed. Defendants contend that jurors 120 and 40 could have simply been confused by the court's instructions or that the jury could have disagreed about how to interpret them. However, nothing in the text of the note suggests that the request for dismissal had anything to do with confusion over the meaning of the instructions. Although the jury had previously sent the trial court a note seeking clarification on what could qualify as predicate activity, there is no indication that this minor, straightforward legal

question played a role in the request for dismissal. In fact, jurors 120 and 40 did not even wait for a response to the question before requesting dismissal.

¶ 132    Moreover, defendants' speculation that the jury was confused about the instructions is simply a rehashing of their arguments as to why the instructions were improper for various reasons. But as we will explain more fully later in this appeal, defendants' challenges to the instructions are largely meritless. For now, it is sufficient to say that the court's instructions were accurate statements of the law and that the jury was required by oath to follow them.

¶ 133    Importantly, at no point did juror 120 or juror 40 mention that they had problems with the evidence in any way. Instead, they asked to be dismissed because they felt the *instructions* were "structured" in such a way to come to "one verdict." Thus, their note strongly implies that they understood how to apply the evidence to the instructions but—for whatever reason—did not want to do so.

¶ 134    This crucial aspect is what distinguishes the present case from *Brown*, on which defendants heavily rely. In *Brown*, the jury had been deliberating for approximately five weeks when one of the jurors, juror Spriggs, sent the trial court a note stating that he was " 'not able to discharge [his] duties as a member of this jury.' " *Brown*, 823 F.2d at 594. When questioned by the trial court, juror Spriggs stated that he had concerns with " 'the way [the RICO statute is] written *and* the way the evidence has been presented.' " (Emphasis in original.) *Id.* at 597. Juror Spriggs also stated that, " '[had] the evidence [been] presented in a fashion in which the law is written, then, maybe, [he] would be able to discharge [his] duties.' " *Id.* On these facts, the *Brown* court concluded that there was "a likelihood" that juror Spriggs requested to be dismissed because he viewed the government's evidence as inadequate. *Id.* Here, by contrast, jurors 120 and 40 expressed no qualms with the evidence. Instead, they focused solely on the instructions. However, jurors must of course

apply the evidence to the law as instructed, even if they personally disagree with the law or the court's instructions. Indeed, jurors 120 and 40 both took an oath to do so in this case. Thus, the trial court did not abuse its discretion by dismissing them when they refused to uphold their oath.

¶ 135                              2. Dismissal of Juror 28

¶ 136    Dawson also contends that he was deprived of his right to a unanimous jury when the trial court dismissed juror 28. According to Dawson, the trial court abused its discretion because juror 28 was dismissed—on the State's motion—only after she revealed herself to be a "defense-leaning witness" by explaining that a person's membership in a gang could not be assumed from a relative's association with a gang.

¶ 137    However, the record shows that the trial court did not dismiss juror 28 for her views on the evidence but for being untruthful during *voir dire* about her "immediate family's" association with street gangs. Notably, Dawson does not dispute that lying in *voir dire* is a proper basis for dismissal. Indeed, lying during *voir dire* generally constitutes the type of misconduct for which it is within the trial court's discretion to remove a juror. *United States v. Delva*, 858 F.3d 135, 158 (2d Cir. 2017); see also *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984) (untruthfulness in *voir dire* indicates potential bias, which implicates a defendant's right to a fair trial). Instead, Dawson asserts that juror 28 did not "lie" on her jury questionnaire but was merely inadvertently untruthful. He posits that juror 28 could have been referring to her half-brothers or that they could have had a distant relationship such that she did not consider them to be "immediately family." Dawson also suggests that, because another question on the jury questionnaire named the Black Souls, juror 28 might have thought the question pertained only to that specific gang.

¶ 138   Initially, we note that the trial court is in a superior position to evaluate juror 28's credibility because it observed her testimony firsthand. *People v. Adkins*, 239 Ill. 2d 1, 21 (2010). The trial court's assessment is therefore entitled to significant deference. *Id.* at 21, 23. Accordingly, our supreme court has stated that

> "[t]he veracity of those who testify during *voir dire* is a matter lying solely within the sound discretion of the circuit court, and the decision to excuse a potential juror because of a reasonable belief that that person has been untruthful under oath is a question best left with that court." *People v. Williams*, 164 Ill. 2d 1, 17 (1994).

¶ 139   Deference aside, we find Dawson's theories to be beyond speculative. The jury questionnaire plainly asked, "Has any member of your immediate family or very close friend ever been involved in a gang?" Juror 28 answered in the negative but then later revealed her brothers were members of the Vice Lords. It was well within the trial court's discretion to consider this a lie, as a sibling is "immediate family" under almost any definition. Additionally, we find it exceedingly unlikely that juror 28 misinterpreted the question as pertaining only to the Black Souls. The text of the question asks about "a gang" generally, without mentioning the Blacks Souls. The risk of confusion was also low because the question that referenced the Black Souls specifically was the one *after* the question juror 28 answered falsely. Thus, the trial court did not abuse its discretion by dismissing juror 28.

¶ 140                                      3. Motion to Interview Juror 40

¶ 141   Finally, defendants contend that the trial court abused its discretion by refusing them an opportunity to interview juror 40 in light of the allegations of racial animus raised by the affidavit from Davis's sister.

¶ 142   Generally, the testimony of a juror cannot be used to impeach a jury's verdict. *People v. Pitsonbarger*, 205 Ill. 2d 444, 468 (2002). "It is well settled that a statement by a juror taken after the jury has rendered its verdict, has been polled in open court, and has been discharged will not be admitted to impeach the jury's verdict." *People v. Hobley*, 182 Ill. 2d 404, 457 (1998). This rule against the impeachment of jury verdicts prevents the admission of a juror's affidavit to show "the motive, method or process by which the jury reached its verdict." *People v. Holmes*, 69 Ill. 2d 507, 511 (1978). The rule is supported by "[s]trong public policy considerations," including protecting jurors from harassment and preserving the integrity of private deliberations. *People v. Williams*, 209 Ill. 2d 227, 239 (2004).

¶ 143   However, the rule against impeachment is not absolute. See *Hobley*, 182 Ill. 2d at 457-58 (juror's affidavit admissible to show jury was exposed to improper outside influences). In *Pena-Rodriguez*, 580 U.S. at 225, the United States Supreme Court recognized a narrow exception to the no-impeachment rule for evidence showing racial bias during deliberations. There, the petitioner was convicted of unlawful sexual contact and harassment against two teenage girls. *Id.* at 212. Following the verdict and discharge of the jury, two jurors informed petitioner's counsel that another juror, H.C., had expressed racial bias against the petitioner and the petitioner's alibi witness during deliberations. *Id.* With the trial court's supervision, counsel obtained affidavits from the two jurors describing H.C.'s statements. *Id.* According to the affidavits, H.C. made statements such as " 'I think he did it because he's Mexican,' " that " 'Mexican men had a bravado that caused them to believe they could do whatever they wanted with women,' " and " 'nine times out of ten Mexican men were guilty of being aggressive toward women and young girls.' " *Id.* at 212-13. H.C. also reportedly stated that he did not believe the petitioner's alibi witness because the witness was " 'an illegal.' " *Id.* at 213. After reviewing the affidavits, the trial court

acknowledged H.C.'s apparent bias but denied the petitioner's motion for a new trial because it believed the affidavits were barred by the no-impeachment rule. *Id.* at 214.

¶ 144   The Supreme Court reversed and remanded, holding:

> "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at 225.

The Court cautioned that "[n]ot every offhand comment indicating racial bias or hostility" is sufficient to warrant further inquiry. *Id.* Rather, "there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Id.* The statements must also "tend to show that racial animus was a significant motivating factor in the juror's vote to convict." *Id.* at 225-26. Whether a defendant has made this showing "is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence." *Id.* at 226.

¶ 145   The State contends that defendants failed to meet their threshold showing for several reasons. The State notes that, since juror 40 was dismissed, she was not a part of the jury that convicted defendants and was therefore not present for the jury's deliberations or votes. The State also points out that, at least in her notes to the trial court, juror 40 only alleged racial comments on the part of juror 143, whom the court promptly dismissed. The State further asserts that juror 40's allegations (as relayed by Davis's sister) were "so vague that [she] could not even recall who said the 'n' word." Thus, the State concludes that the allegations in the present case fall well short of the specific, detailed allegations of bias in *Pena-Rodriguez.*

¶ 146   We do not disagree that juror 40's reported allegations are not as specific as those in *Pena-Rodriguez*. However, in our view, the State's arguments miss the point. Here, the trial court prohibited the defense from communicating with juror 40, thus significantly hamstringing its ability to assess her allegations. It was only by happenstance that Davis's sister learned of juror 40's allegations after reaching out to Representative Ford. And as it turned out, juror 40 was apparently more than willing to speak to the defense but for the court's order prohibiting contact. Not only did juror 40 appear eager to speak to Representative Ford and Davis's sister, she also took it upon herself to attend a posttrial hearing and attempt to speak to defense counsel. As the Supreme Court recognized in *Pena-Rodriguez*, contacting defense counsel is a "common" way jurors come forward with claims of racial bias. *Id.* at 227. However, here—unlike in *Pena-Rodriguez*—the trial court did not allow the defense to obtain an affidavit from juror 40, so it is no surprise that the second-hand allegations are somewhat vague and incomplete.[7]

¶ 147   While we recognize that the trial court faced a difficult situation and took great care not to intrude into the jury's deliberative process, we must conclude that the court abused its discretion in refusing to allow the defense to obtain juror 40's affidavit. Our determination is supported by the fact that jurors 120 and 40 had already brought forth credible allegations of "racial bullying" by juror 143 that ultimately lead to juror 143's dismissal. In that sense, the allegations juror 40 made to Davis's sister are consistent with the picture of racially charged and obviously contentious

---

[7]To be sure, the same policy considerations underlying the no-impeachment rule also generally support limiting the parties from postverdict contact with the jurors. One obvious reason is that every unsuccessful defendant would have motive to harass jurors in an effort to discover misconduct that might give rise to a new trial. *Tanner v. United States*, 483 U.S. 107, 119-20 (1987). However, this is not what happened here. In any event, it remains true that a juror can always tell defense counsel that he or she does not wish to discuss the case, and the juror may report any perceived harassment to the trial court. *Pena-Rodriguez*, 580 U.S. at 226.

deliberations painted by the record. Juror 40 was also consistent in stating to Representative Ford that the deliberations were "very unfair."

¶ 148   As noted, the State points out that juror 40's notes to the trial court accused only juror 143 of making racial comments. However, juror 40's allegations to Davis's sister suggest multiple jurors (they) used the "n" word and other epithets. This may be an inconsistency, but it seems at least equally likely that it is a consequence of filtering juror 40's allegations through other parties. Indeed, while the trial court interviewed several other jurors in this case, the court never heard directly from juror 40. All the notes signed by juror 40 were also signed by juror 120, the foreperson who appears to have authored all the notes sent to the trial court. And of course all of juror 40's postverdict allegations are relayed from Davis's sister's recollection of a phone conversation with her. In our view, this only highlights the need to hear from juror 40 herself.

¶ 149   In denying the defense's motion to obtain juror 40's affidavit, the trial court stated that it was unnecessary to interview juror 40 because she lacked credibility after violating her oath to honor laws with which she disagreed. Although the trial court's superior ability to observe the proceedings entitles its credibility determinations to substantial deference, we find it difficult to see how the court could arrive at a reliable credibility determination without even hearing juror 40's account. Essentially, a review of the record leaves us with the distinct sense that juror 40's plausible allegations of racial bias were given short shrift. As *Pena-Rodriguez* makes clear, the sixth amendment requires more to combat the specter of racial discrimination, which is "odious in all aspects, is especially pernicious in the administration of justice." (Internal quotation marks omitted.) *Id.* at 223. This is especially so where the trial court could have given juror 40 an opportunity to be heard with minimal invasion into the deliberations process. Accordingly, we remand the matter for further inquiry into juror 40's claims. Assuming she is still willing to speak

about the case, we believe the best course of action is, like in *Pena-Rodriguez*, for the defense to obtain juror 40's affidavit under the supervision of the trial court. This will ensure that her allegations will be heard with minimal invasion of deliberative secrecy. The trial court may then consider the affidavit and decide whether it is sufficient to warrant an evidentiary hearing.

¶ 150   Although we remand the matter, we will address defendants' remaining arguments for the sake of judicial economy, as they are likely to arise again, especially if a new trial does not prove necessary.

¶ 151                                   B. *Voir Dire*

¶ 152   Dawson and Spears next contend that the trial court erred in denying their request to ask certain questions during *voir dire*.

¶ 153   *Voir dire* is designed to effectuate a criminal defendant's constitutional right to an impartial jury. *People v. Encalado*, 2018 IL 122059, ¶ 24. As such, " '[t]he purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.' " *Id.* (quoting *People v. Cloutier*, 156 Ill. 2d. 483, 495-96 (1993)). The scope and extent of *voir dire* rests within the sound discretion of the trial court. *Id.* ¶ 25. "An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice." *People v. Rinehart*, 2012 IL 111719, ¶ 16. Put differently, a trial court does not abuse its discretion where its questions create a reasonable assurance that any potential prejudice or bias would be discovered. *Id.* Moreover, a particular question is not constitutionally required merely because it would be helpful in ferreting out bias. Rather, the court's failure to ask the question must render the proceedings fundamentally unfair. *Encalado*, 2018 IL 122059, ¶ 25.

¶ 154                                          1. Drug Bias

¶ 155   In this case, defendants first contend that the trial court erred in denying their requests to inquire about prospective jurors' feelings about drugs. Specifically, the defense sought to ask:

> "Do you have any family members or close friends who suffer from an addiction to illegal narcotics? If your answer is yes, do you believe that you could still render a fair and impartial decision in a case where some of the charges involve the sale and/or distribution of illegal narcotics?"

Alternatively, defendants proposed asking:

> "There may be evidence as to drugs in this case. Would such evidence impact your ability to be a fair and impartial juror in this case? If so, why?"

¶ 156   Initially, defendants assert that the trial court denied these requests because it "mistakenly believ[ed] Illinois precedent prohibited such questions." However, this contention is belied by the record. Rather, the record shows that the court merely cited the "precedent" in question—*People v. Abram*, 2016 IL App (1st) 132785, and *People v. Lanter*, 230 Ill. App. 3d 72 (1992)—for the proposition that the proposed questions about drugs were not required. And those cases do, in fact, support the trial court's position. In *Abram*, for example, we affirmed the trial court's decision not to inquire about potential jurors' biases against drug use even though the defendant was charged with possession of cocaine with the intent to deliver. *Abram*, 2016 IL App (1st) 132785, ¶ 63. In so ruling, we acknowledged that in *Strain*, 194 Ill. 2d at 477, (a case upon which defendants also heavily rely), our supreme court held that a defendant must be given an opportunity to question the venire about gang bias in cases where gang membership and activity are integral to the trial. *Abram*, 2016 IL App (1st) 132785, ¶ 63. However, we also explained that Illinois courts have

specifically declined to extend the reasoning of *Strain* to other potential biases, including bias against drug dealers. *Id.* (citing *People v. Dixon*, 382 Ill. App. 3d 233, 245 (2008)).

¶ 157   In *Lanter*, the Fourth District held that the defendant was improperly prevented from inquiring about drug and alcohol bias where the defendant raised an affirmative defense of his own intoxication in an aggravated assault case. *Lanter*, 230 Ill. App. 3d at 75-76. However, as the trial court observed here, *Lanter* has been confined to cases in which the defendant cites his *own* drug or alcohol abuse as an affirmative defense. See, *e.g.*, *Abram*, 2016 IL App (1st) 132785, ¶ 64; *Dixon*, 382 Ill. App. 3d at 244; *People v. Tenney*, 347 Ill. App. 3d 359, 369 (2004). In this case, defendants did not raise any defense related to their own drug use, and the defendants' drug use was not an issue at trial. See *Abram*, 2016 IL App (1st) 132785, ¶ 63 ("Drug use itself, as opposed to the illegal act of possessing a controlled substance, was not an integral part of this case as gang membership was in *Strain* ***.").

¶ 158   Essentially, defendants' argument is that questions of drug bias should have been allowed because drugs are a "controversial issue" that "evoke[s] strong feelings" among potential jurors. In this regard, defendants liken their case to *Strain*; however, as we have explained, this court has confined *Strain* to the context of gang bias. *Id.* Moreover, defendants have cited no Illinois case requiring the trial court to inquire about views on drug use outside the context of *Lanter*. Indeed, this court has already declined to extend the rationale of *Strain* to drug bias. *Id.*; *Dixon*, 382 Ill. App. 3d at 245. We see no reason to depart from these rulings here.

¶ 159   As a final note on this issue, we acknowledge defendants' observation that "[i]ncluding a question or two [about drugs] on the juror questionnaire would not have created any judicial hardship or complicated the *voir dire* process." This point is well taken; however, we are not deciding whether it would have been permissible for the court to question the venire about drug

bias. Additionally, the relevant legal standard on appeal is not what this court would have done in the first instance but whether the trial court abused its discretion by thwarting the purposes of *voir dire*. See *People v. Runge*, 234 Ill. 2d 68, 105 (2009) (" '[T]he whole point of discretion is that there is [a] range of options open, which means more than one choice is permissible. The broader the discretion, the greater the range of choice and the less room for reversal.' " (quoting *United States v. Dominguez*, 226 F.3d 1235, 1247 (11th Cir. 2000))). For the reasons previously explained, we cannot say that the trial court abused its discretion in this case.

¶ 160                                  2. Gang Bias

¶ 161    Dawson and Spears also argue that the trial court erred in "limiting" their ability to inquire about gang bias during *voir dire*. As discussed, our supreme court in *Strain* held that where, as here, "testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." *Strain*, 194 Ill. 2d at 477.

¶ 162    In this case, the trial court gave prospective jurors an extensive, 88-question questionnaire. Three of those questions probed the venire's potential bias towards gangs. In particular, the questionnaire asked:

        (1) "Has any member of your immediate family or very close friend ever been involved in a gang? If yes, please explain[;]"

        (2) "Have you had any experiences observing, living near or dealing with the Black Souls street gang in Chicago? If yes, please explain"; and

        (3) "There will be evidence, that some of the witnesses or participants in this case are gang members or associated with street gangs. Can you put aside any feelings or

opinions of gang bias and decide the case fairly based only on the evidence presented and the law as provided to you by Judge McHale? If no, please explain[.]"

¶ 163    Nevertheless, defendants contend that they should have been allowed to ask additional questions concerning gang bias. Specifically, the trial court denied Dawson's request to ask,

"In this case you will hear evidence about street gangs. Do you believe that association with street gang members or actual membership in a street gang would keep you from rendering a fair and impartial verdict in this matter?"

The court also denied Spears's proposal to ask,

"There may be evidence in this case that the defendants are members of a street gang. Would such evidence impact your ability to be a fair and impartial juror in this case? If so, why?"

Finally, Davis proposed asking,

"If you found out that the defendants are members of a gang, would you believe it is more likely that they were involved in criminality?"

¶ 164    Notwithstanding the denial of these requests, we find that questions the trial court did allow were sufficient to protect defendants' right to an impartial jury. Contrary to defendants' suggestion, *Strain* did not "require" any specific questions be asked, only that a defendant be afforded a meaningful opportunity to question prospective jurors about gang bias. See *id.* There are countless questions the court could have asked to accomplish this goal. Here, the court choose to ask several questions about gang bias, including whether the prospective jurors could decide the case based on the law and evidence, rather than their opinions on gangs.

¶ 165    Even so, defendants take umbrage with the wording of the court's questions, specifically the third question, asserting that it improperly required members of the venire to "self-assess bias" and "suggested the answer the court deemed appropriate." We fail to see how the court's questions required a self-assessment of bias any more than defendants' proposals. Either way, each prospective juror would have been asked to determine if he or she could render an impartial verdict even though many of the participants in the trial were associated with street gangs. Similarly, we find the court's question no more "leading" than any others. A prospective juror would no doubt assume the "correct" response is always to remain fair and impartial, regardless of the context. Ultimately, the gang questions used in this case reasonably ensured that the jury would remain fair and impartial despite the involvement of gangs. Thus, the purpose of *voir dire* was fulfilled and there was no abuse of discretion.

¶ 166                    C. Suppression of ESO Evidence

¶ 167    Dawson and Davis next contend that the trial court erred in refusing to suppress the wiretap evidence obtained pursuant to the ESOs. In particular, they argue that the applications for the ESOs violated both Illinois and federal law because they were signed by an assistant state's attorney, rather than by the State's Attorney herself. The State maintains the ESO applications were facially valid, and even if they were not, the defect was not substantive enough to warrant suppression. The State also argues that, regardless, the admission of the ESO evidence was harmless.

¶ 168    When reviewing a trial court's ruling on a motion to suppress, we apply a two-part standard of review. *People v. Brooks*, 2017 IL 121413, ¶ 21. The trial court's factual findings are entitled to great deference and will be reversed only if they are against the manifest weight of the evidence. *Id.* However, the court's ultimate legal ruling on whether the evidence should be suppressed is

Nos. 1-18-1491, 1-18-1818, 1-18-1819, and 1-18-1820 (cons.)

reviewed *de novo*. *Id.* Here, the facts surrounding the ESO applications are essentially undisputed, so we review the trial court's ruling *de novo*.

¶ 169    In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, amending Title 18 of the United States Code to add Chapter 119 (now codified at 18 U.S.C. §§ 2510 to 2522 (2012)) (Title III) to provide uniform conditions under which law enforcement may intercept private communications. *People v. Coleman*, 227 Ill. 2d 426, 433-34 (2008). Our supreme court has held that Congress intended Title III to preempt the field of electronic surveillance. *Id.* at 434. However, Title III also explicitly permits concurrent state regulation. *Id.* (citing 18 U.S.C. § 2516(2) (2012)). Thus, states such as Illinois may adopt more stringent standards than those found in federal law, but they may not go below the floor set by Title III. *Id.*

¶ 170    Title III generally prohibits the interception and disclosure of private communications absent certain exceptions. Of relevance here is section 2516(2), which provides

"*The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof*, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral, or electronic communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made ***." (Emphasis added.) 18 U.S.C. § 2516(2) (2012).

- 44 -

¶ 171    Similarly, article 108B of the Code provides that only "[a] State's Attorney may apply for an order authorizing interception of private communications in accordance with the provisions of this Article." 725 ILCS 5/108B-2(a) (West 2012). Article 108B further states:

> "[t]he State's Attorney, or a person designated in writing or by law to act for him and to perform his duties during his absence or disability, may authorize, in writing, an ex parte application to the chief judge of a court of competent jurisdiction for an order authorizing the interception of a private communication when no party has consented to the interception ***."*Id.* § 108B-3(a).

The application must be made in writing upon oath or affirmation and shall include, among other things, "[t]he authority of the applicant to make the application." *Id.* § 108B-4(a)(1); see also 18 U.S.C. § 2518(1) (2012) (an application "shall state the applicant's authority to make such application").

¶ 172    In this case, the ESOs challenged by Dawson and Davis arose from four applications filed by the State pursuant to article 108B. Each application was signed by then-ASA Shauna Boliker and contained substantially similar language:

> "I, Shauna Boliker, being duly sworn, deposes and says:
>
>  [ ] I am the First Assistant State's Attorney of Cook County, Illinois, and as such, I am duly designated to make this application (hereinafter 'Application'), and I am authorized by law to investigate, prosecute, and participate in the prosecution of the SUBJECT OFFENSES noted below which are the subject of this Application."

¶ 173    The facts are similar to those in *Allard*, which defendants raised in their posttrial motion. In *Allard*, two high-ranking ASAs in the Lake County State's Attorney's Office applied for several article 108B ESOs as part of its investigation into the Four Corner Hustlers street gang. *Allard*,

Nos. 1-18-1491, 1-18-1818, 1-18-1819, and 1-18-1820 (cons.)

2018 IL App (2d) 160927, ¶ 7. Each application stated that it was submitted " 'on behalf of Michael G. Nerheim, State's Attorney of Lake County.' " *Id.* ¶ 8.

¶ 174 The defendants moved to suppress the evidence obtained via the ESOs, arguing that the applications were invalid because State's Attorney Nerheim neither personally signed the applications nor gave the ASAs written authorization to submit the application on his behalf. *Id.* ¶ 13. In response, the State submitted a letter from State's Attorney Nerheim, dated before the applications were made, in which he granted one of the ASAs " 'authorization for the interception of private communications pursuant to the requirements as set forth in [the eavesdropping statute].' " *Id.* At the suppression hearing, the State also presented affidavits showing that State's Attorney Nerheim verbally authorized the ASA to apply for ESOs following a January 2014 meeting. According to the affidavits, the ASA regularly apprised State's Attorney Nerheim on the investigation, and State's Attorney Nerheim remained involved in the investigative process. *Id.* ¶ 14.

¶ 175 The trial court suppressed the ESO evidence, observing that State's Attorney Nerheim did not sign the applications and that there was no evidence he was absent or disabled at the time they were filed. *Id.* ¶¶ 17-18. Thus, the trial court ruled that the applications violated both Illinois law and Title III. *Id.* ¶ 18.

¶ 176 On appeal, the Second District affirmed the suppression, reasoning that the ESO applications were facially deficient in several ways. First, the Second District held that the signatories did not sufficiently identify the source of their authority to make the application where they merely stated that they were " 'authorized by law to investigate, prosecute, and participate in the prosecution of the particular offenses which are the subject of this application.' " *Id.* ¶ 33. Second, the applications did not incorporate any of the evidence that State's Attorney Nerheim

- 46 -

delegated authority to the ASAs, and there was no evidence that the delegation was due to State's Attorney Nerheim's absence or disability. *Id.* Indeed, the court noted that the evidence suggested State's Attorney Nerheim was not absent, as he averred that he remained an active participant in the investigation. *Id.* ¶ 34. As such, the Second District concluded that the applications did not comply with Illinois law and the evidence was properly suppressed. *Id.* ¶ 56.

¶ 177    Here, as in *Allard*, ASA Boliker did not identify the source of her authority to apply for the ESOs. The State insists this requirement was satisfied because the applications stated that ASA Boliker was "duly designated" and "authorized by law." However, these statements assert only *that* she was authorized, not *why*. This language is virtually identical to the language the Second District rejected in *Allard*. See *id.* ¶ 33. The applications in this case plainly state that ASA Boliker was "duly designated" simply because she was the first assistant state's attorney. However, both article 108B of the Code and Title III generally allow only for the state's attorney to apply for the type of order relevant here. 18 U.S.C. § 2516(2) (2012); 725 ILCS 5/108B-2(a) (West 2012). Although ASA Boliker was a high-ranking attorney in the Cook County State's Attorney's Office, she was not the state's attorney.

¶ 178    Additionally, while article 108B allows a state's attorney to delegate application authority in some circumstances, that is not what happened here. At a minimum, article 108B requires that any delegation be in writing. 725 ILCS 5/108B-3(a) (West 2012). As in *Allard*, the ESO applications in the present case did not mention anything about the state's attorney delegating authority. Indeed, the facts of this case are worse for the State than *Allard*, as here the State produced no evidence of any delegation by State's Attorney Alvarez that may have occurred outside of the applications.

¶ 179   This also differentiates the present case from *United States v. Spann*, 409 F. Supp. 3d 619 (N.D. Ill. 2019), which the State argues is "on all fours with the instant case." In *Spann*, a federal district court found "sufficient evidence that [State's Attorney] Alvarez 'personally participated' in the application process and 'actually authorized' every wiretap application made on her behalf during her tenure." *Id.* at 623. However, the *Spann* court based this conclusion on affidavits and testimony from both State's Attorney Alvarez and ASA Boliker. *Id.* at 621-22. Here, there was no such evidence presented to the trial court.

¶ 180   With this in mind, we reject the State's argument that any noncompliance with article 108B was a "procedural error" or "technical violation" that did not warrant suppression. In advancing this argument, the State relies on cases in which, despite technical deficiencies, there was evidence that the applications were actually approved by an official with the proper statutory authority. For example, in *United States v. Chavez*, the relevant statute vested application authority in the attorney general or any assistant attorney general (AAG) who had been designated by the attorney general. *United States v. Chavez*, 416 U.S. 562, 566 (1974); 18 U.S.C. § 2516 (1976). The application in question listed the authorizing official as AAG Will Wilson, who, according to the application, had been specially designated by the attorney general. *Chavez*, 416 U.S. at 566. However, later evidence showed that, although AAG Wilson had not actually been designated with application authority, the attorney general himself personally approved the application. *Id.* at 566-68. The United States Supreme Court held that the application was facially sufficient because AAG Wilson would have had application authority if, as the application claimed, he had been designated by the attorney general. *Id.* at 573-74. The Court also held that suppression was not required, as the purposes of the statute were fulfilled where the attorney general had in fact authorized the application. *Id.* at 579-80.

¶ 181    Despite the State's comparison, the present case is not like *Chavez*. First, as discussed, the applications in this case were not facially valid. They do not, for example, falsely state that ASA Boliker obtained written designation from State's Attorney Alvarez. Instead, the applications do not mention State's Attorney Alvarez at all. Second, unlike in *Chavez*, there is no evidence that State's Attorney Alvarez actually approved the applications.

¶ 182    Rather, this case is more like *United States v. Giordano*, 416 U.S. 505 (1974), a companion case that was decided the same day as *Chavez*. In *Giordano*, like *Chavez*, the applications (falsely) recited that AAG Wilson had been specially designated by the attorney general. *Id.* at 509. However, evidence presented at the suppression hearing showed that the attorney general had neither approved the applications nor designated AAG Wilson to authorize them on his behalf. *Id.* at 509-10. The Supreme Court held that the evidence was properly suppressed, stating, "We are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." *Id.* at 528. Here, like *Giordano*, the State presented absolutely no evidence to the trial court showing that State's Attorney Alvarez approved the application or designated ASA Boliker to do so. Thus, suppression of the ESO evidence was warranted.

¶ 183    That being said, we agree with the State that the admission of the evidence was mostly harmless. The erroneous admission of evidence is harmless where the remaining evidence overwhelmingly supports the conviction. *People v. Heineman*, 2023 IL 127854, ¶ 95. Stated differently, the improper admission of evidence is harmless error if there is no reasonable probability that the verdict would have been different had the evidence in question been excluded. *People v. Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 53.

¶ 184    Here, defendants identify three instances in which they say the improperly admitted evidence was prejudicial. First, defendants cite Dawson's statement that Detective O'Donovan was "talkin' about Charles" after Detective O'Donovan asked about "the guy that was killed and buried in the back yard over on Monroe Street."[8] However, this evidence was not highly incriminating, as it proved only that Dawson was aware that a person named Charles was brutally murdered in his neighborhood. In any event, the evidence that the NLBS were responsible for Watson's murder was overwhelming. Stokes testified that Redfield and other NLBS members accused him and Watson of stealing from the gang. Stokes and Watson were beaten, tied up, and driven to an abandoned building, the last place Watson was seen alive. Hughes testified that, shortly before Stokes and Watson were brought to the abandoned building, Redfield spoke to Dawson and Lemon. Immediately following this conversation, Dawson asked Hughes to clear the building. Finally, Hughes testified that Dawson and Lemon gave him a shovel and ordered him to dig what would become Watson's unceremonious grave. Thus, there is no reasonable probability that the jury would have found defendants not guilty of the murder had Dawson's innocuous statement been suppressed.

¶ 185    However, the other two pieces of wiretap evidence identified by defendants are more incriminating. Specifically, defendants point to the phone call in which Ceasar tells Dawson that he "had to flush the shit" because the police were trying to force their way into his apartment. Based on this evidence, the police were able to arrest Ceasar in possession of 17.3 grams of heroin the next day. Similarly, the wiretap evidence captured Dawson coordinating with Elverton to pick

---

[8]The quoted portion was Detective O'Donovan's words at trial. The record indicates he might have actually used the phrase "the Soul in the Hole" when speaking to Dawson, which the Watson murder came to be known as in the neighborhood.

up 26.6 grams of heroin from an unidentified third party. Information from the wiretap allowed the police to pull over Elverton's van and recover the drugs.

¶ 186   We agree with defendants that this tainted evidence was the only evidence of Ceasar's and Elverton's possession with the intent to deliver. Thus, without the wiretap evidence, no rational jury could have found that defendants' criminal drug conspiracy included these specific acts of possession with the intent to deliver. However, the error in admitting the evidence is still harmless for two reasons. First, the exclusion of the wiretap evidence would not have detracted from the plethora of other evidence that defendants were engaged in a systematic and far-reaching conspiracy to sell drugs. Thus, there is no reasonable probability that defendants would have been acquitted of criminal drug conspiracy had the ESO evidence been suppressed. Second, and importantly, the Ceasar and Elverton incidents played no part in defendants' sentences for criminal drug conspiracy. The sentencing range for criminal drug conspiracy varies depending on the amount of drugs involved. 720 ILCS 570/401, 405.1(c) (West 2012). Although the jury found that the Ceasar and Elverton possessions were part of the conspiracy, the applicable sentencing range was based solely on Scott's possession of 263.4 grams of heroin, which was the largest single amount involved. Thus, if the ESO evidence had been suppressed, there is no doubt that defendants would still have been convicted of criminal drug conspiracy and sentenced to 40 years in prison. Accordingly, the erroneous admission of this evidence was harmless.

¶ 187                           D. Alex Williams's Testimony

¶ 188   Dawson and Davis next argue that the trial court erred in allowing Alex Williams, the State's confidential informant, to give impermissible lay witness opinion testimony when he interpreted the meaning of certain words and phrases used in the conversations he recorded with defendants.

¶ 189   The foundational requirements for nonexpert opinion testimony are governed by Illinois Rule of Evidence 701 (eff. Jan. 1, 2011). Under Rule 701, a lay witness may only give an opinion or draw an inference if it is "rationally based on the perception of the witness." *Id.*; *People v. Thompson*, 2016 IL 118667, ¶ 50. Stated another way, the witness must have personal knowledge of the matters to which he testifies. *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 79. Rule 701 also requires that the opinion be helpful to a clear understanding of the witness's testimony and not based on scientific, technical, or specialized knowledge. *Id.* When considering whether a lay witness's opinion as to what a declarant meant by a statement is admissible under Rule 701, courts should consider the facts, circumstances, and context under which the statement was made. *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 43. A trial court's decision on whether to admit lay witness opinion testimony is reviewed for abuse of discretion. *Thompson*, 2016 IL 118667, ¶ 49.

¶ 190   Defendants acknowledge that much of Williams's interpretation of their statements involved explaining the meaning of various slang terms. Defendants do not dispute that Williams's testimony was proper in this regard, so we need not consider the issue as it relates to slang terms. See *People v. Grant*, 2013 IL 112734, ¶¶ 14-15 (police officer properly allowed to testify "dro" was a slang term for marijuana). However, defendants contend that other aspects of Williams's testimony went beyond providing the meaning of slang terms and crossed into the territory of impermissible lay witness opinion. We disagree and instead find that Williams's testimony satisfied the requirements of Rule 701. First, Williams's testimony was rationally based on his perceptions and was helpful to the jury's understanding of his conversations with defendants. See *People v. McLaurin*, 2015 IL App (1st) 131362, ¶¶ 39-40 (testimony that " 'you stretched buddy' " meant the defendant killed the victim admissible under Rule 701); *Donegan*, 2012 IL App (1st)

102325, ¶¶ 40, 45 (testimony that codefendant meant " 'go do a shooting' " by statement that he was going to " 'do some business' " admissible under Rule 701).

¶ 191   We also note that, in their briefs, Dawson and Davis primarily take issue with Williams identifying the subject of certain conversations. For example, they observe that Williams testified that certain conversations were about the Snulligan and Taylor murders, even though neither victim was mentioned by name. However, defendants were not prejudiced by this testimony because the conversations in question were obviously about Snulligan and Taylor, respectively. *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001) ("Improper opinion testimony is not necessarily prejudicial where the conclusion or testimony adduced is an obvious one."). The November 28, 2012, conversation between Williams and Dawson occurred approximately one month after the Snulligan murder, while Odum was still in custody for charges related to his assault on Snulligan. Therein, Williams mentions Spears (by his nickname "Lil' Sapp") and that he saw the events "on Madison," which was the area where Spears murdered Snulligan. Slightly later in the conversation, Dawson states that Odum had been charged with battery and attempted kidnapping because the "mark" they were discussing had claimed he was beaten with a pistol and almost forced into the trunk of a car. Dawson also details his attempts to bribe this person and force him to sign an exculpatory affidavit for Odum's lawyer. Finally, they discuss how the charges against Odum were sure to be dropped now that the "vic" was dead. All of this was consistent with what the jury had already heard about Snulligan, and thus it was obvious the conversation was about him.

¶ 192   Similarly, the first conversation that Williams testified was about the Taylor murder took place on January 10, 2013, just two days after Taylor's murder. Williams, Dawson, and Davis discuss that the deceased was a rapper who was expecting to receive a bonus check. Davis also describes how the killers came through an alley and were caught on surveillance footage. Again,

these details all match what the jury had previously heard about Taylor's murder. The other conversation about Taylor involved discussion of a funeral that occurred 10 days after Taylor's murder. In that conversation, Dawson asks whose funeral it was, and Davis replies, "[o]n Wilcox," which was the area where Taylor was killed. Thus, it was obvious from context that those conversations were about Taylor, regardless of Williams's testimony. Accordingly, even if the trial court erred in admitting Williams's testimony, any such error was harmless.

¶ 193                                E. Sufficiency of the Evidence

¶ 194    Dawson and Lemon further argue that the State failed to prove their guilt beyond a reasonable doubt in various ways. When a defendant challenges the sufficiency of the evidence, the relevant question for the reviewing court is whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brand*, 2021 IL 125945, ¶ 58. Under this standard, all reasonable inferences must be made in the State's favor. *People v. Baskerville*, 2012 IL 111056, ¶ 31. It is not our role to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. Rather, it remains the jury's responsibility to decide the credibility of the witnesses, assign weight to the evidence, and draw reasonable inferences from the facts. *Id.* We will therefore not substitute our judgment for that of the jury on issues involving the weight of the evidence or credibility of the witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. "[I]n weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." (Internal quotation marks omitted.) *People v. Hardman*, 2017 IL 121453, ¶ 37. We will not reverse the jury's verdict for lack of evidence unless the evidence is "so unreasonable,

improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 195                                    1. Lemon

¶ 196    Lemon contends that the State failed to prove him guilty of racketeering conspiracy beyond a reasonable doubt. As relevant here, a person commits racketeering conspiracy when he (1) "intentionally participates in the operation or management of an enterprise, directly or indirectly" and (2) knowingly agrees with another to (3) the commission of three or more "predicate activit[ies]" as defined in the statute. 720 ILCS 5/33G-4(a)(3) (West 2012). Either the defendant or a coconspirator must also commit an overt act in furtherance of their agreement. *Id.*

¶ 197    At issue here is the first element, that the defendant must "intentionally participate[ ] in the operation or management" of an enterprise. *Id.* The RICO statute defines those who participate in the operation or management of an enterprise as "any person who knowingly serves as a leader, organizer, operator, manager, director, supervisor, financier, advisor, recruiter, supplier, or enforcer of an enterprise in violation of this Article." *Id.* § 5/33G-3(d).

¶ 198    Lemon argues that the State did not prove he served in one of these roles for the NLBS. It is true that some witnesses did not testify that Lemon was one of the gang's formal leaders. For example, Williams testified that he did not see Lemon actively participating in the drug trade and that he would "[j]ust basically be around." Learies Brown testified that Lemon was only associated with the NLBS through his brother, Dwayne Lemon, the former Chief. And while Detective Lipsey testified that the other defendants held some rank in the gang, he did not mention Lemon.

¶ 199    However, there was ample other evidence that Lemon had deep ties to the NLBS apart from his familial relation to Dwayne Lemon and Dawson. Lemon had multiple NLBS tattoos and was seen flashing gang signs with other NLBS leaders in numerous photographs. He attended

meetings and punished members for violating gang rules. Moreover, multiple witnesses testified that Lemon held rank in the NLBS. Deandre Pierce described Lemon as a "manager type" who oversaw the 4000 block of West Monroe Street and the 4100 block of West Wilcox Street. According to Pierce, defendant Lemon was "always" on those blocks "supervising like a boss." Jubali Stokes testified that Lemon was briefly "in charge" of the NLBS in 2001 and was "right up under" Dawson by 2002. Orlando Benamon testified that he sold drugs for Lemon and gave him the proceeds. Lemon was also one of the "older guys" or "higher ranking members" who was protected by a security detail. Lemon was able to speak directly to Dawson, which only high-ranking members were allowed to do. Lemon was also present for the interrogations of Stokes and Watson and ordered Hughes to dig Watson's grave.

¶ 200    Ultimately, it was the jury's role to resolve this arguably conflicting evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). Taking all the evidence in the light most favorable to the State, which we must, we find that there was sufficient evidence for a rational jury to conclude that Lemon was involved in the management of the NLBS.

¶ 201    Lemon further argues that the State did not prove that he agreed to a pattern of predicate activity. Specifically, he asserts that there was "no evidence" connecting him to the Snulligan and Taylor murders. However, the State was not required to prove that Lemon directly participated in either murder. *United States v. Benabe*, 436 F. App'x 639, 657 (7th Cir. 2011) (*per curiam*). Lemon's agreement to those murders can be proved through circumstantial evidence that he and his coconspirators shared the same criminal objective. *Salinas v. United States*, 522 U.S. 52, 63-64 (1997). As detailed above, the evidence established that Lemon was a leader of the NLBS who joined a far-reaching conspiracy to sell drugs. The evidence also showed that Snulligan and Taylor were murdered in furtherance of the NLBS's drug operation. Overwhelming evidence

demonstrated that Snulligan was murdered in a coordinated attack by the NLBS because he complained about the gang selling drugs in his neighborhood, and then incriminated Odum when he attempted to silence him. Similarly, the evidence showed that Taylor was murdered in retaliation for the killing of one of the NLBS's drug sellers. Taking this evidence in the light most favorable to the State, a rational jury could conclude that Lemon agreed to the Snulligan and Taylor murders as part of the conspiracy to sell drugs.

¶ 202 We further find that the evidence was sufficient to convict Lemon of criminal drug conspiracy. To sustain the charge of criminal drug conspiracy, the State was required to prove that Lemon agreed with another to the commission of either (1) possession of a controlled substance with intent to deliver or (2) delivery of a controlled substance. 720 ILCS 570/405.1 (West 2012). Again, the evidence established that Lemon was a senior member of the NLBS, who were indisputably engaged in a widespread drug dealing operation. Indeed, numerous NLBS members and associates were arrested after selling drugs to undercover officers. The police also recovered drugs and drug-packaging equipment from the homes of multiple NLBS members. Lemon himself was arrested in possession of a grinder, two digital scales, and numerous plastic Baggies. Orlando Benamon testified that he sold drugs for Lemon back in 2002. Deandre Pierce testified that Lemon still "supervis[ed]" the NLBS's drug markets up until his arrest in 2013. Lemon was also a passenger in Odum's van when Ceasar received a bundle of cash through a basement window and delivered it to Odum. This was the same basement window through which Ceasar had previously sold drugs to undercover officers. Drawing all reasonable inferences in the State's favor, this is sufficient evidence to conclude that Lemon was part of the agreement to sell drugs.

¶ 203                                         2. Dawson

¶ 204   Dawson argues that, for purposes of establishing reasonably foreseeable unlawful deaths, the State failed to prove that he was "engaged in the violation of [the RICO statute]" at the time of the Watson and Keys murders. Consequently, Dawson contends that his sentences for those unlawful deaths should be vacated.

¶ 205   Section 33G-5(c) of the RICO statute requires the imposition of an additional sentence of 25 years to life for each unlawful death that (1) was "reasonably foreseeable to the defendant" and (2) "occurred when the defendant was otherwise engaged in the violation of this Article as a whole." 720 ILCS 5/33G-5(c)(1)-(2) (West 2012).

¶ 206   Dawson does not dispute that Watson's and Keys's deaths were reasonably foreseeable to him. Indeed, the evidence established that Dawson personally ordered both of those murders, which occurred in June 2002 and July 2003, respectively. However, Dawson's argument is that he was not engaged in a racketeering conspiracy at the time of those murders because, as of 2003, he had not yet agreed that any specific predicate acts would occur after the RICO statute took effect in June 2012. We disagree with Dawson's narrow interpretation of the statute.

¶ 207   First, the statute punishes a defendant for reasonably foreseeable deaths that occur while he was engaged in a racketeering violation "as a whole." *Id.* This language is broad and does not include any time restrictions. Dawson's argument relies on the fact that the statutory definition of "predicate activity" includes only crimes that occur after the statute's effective date. *Id.* § 33G-3(f)(2). However, the gravamen of a racketeering violation is not just engaging in a pattern of predicate activity but conducting an enterprise through a pattern of predicate activity. *United States v. Phillips*, 664 F.2d 971, 1012 (5th Cir. 1981). The evidence showed that Dawson was in charge of the NLBS by 2002 and conducted the enterprise's affairs through a series of criminal acts until his arrest in 2013. Moreover, defendants were charged with racketeering conspiracy, which

requires not only an agreement to commit predicate acts but also the actual commission of at least one overt act in furtherance of the conspiracy. 720 ILCS 5/33G-4(a) (West 2012). Unlike the definition of predicate activity, there is no time limitation on when the overt act must occur. *Id.* An overt act may occur prior to the effective date of the statute, as the overt act need not constitute predicate activity. *Id.* Thus, at the very least, Dawson and his coconspirators had committed overt acts in furtherance of their racketeering conspiracy at the time of Watson's and Keys's murders.

¶ 208 We also note that, as Dawson points out, the requirement that predicate acts occur after the statute's effective date was included to avoid violating the *ex post facto* clauses of the United States and Illinois Constitutions (U.S. Const., art. I, § 9; Ill. Const. 1970, art. I, § 16). Here, there is no *ex post facto* issue because defendants continued to participate in the conspiracy after the effective date of the statute. *United States v. Hersh*, 297 F.3d 1233, 1244 (11th Cir. 2002); *United States v. Garcia Abrego*, 141 F.3d 142, 167 (5th Cir. 1998). Additionally, as the RICO statute requires, defendants were convicted based on the agreement to commit predicate acts after the effective date. Thus, Dawson's life sentences based on the reasonably foreseeable deaths of Watson and Keys were not in error.

¶ 209                                    F. Jury Instructions

¶ 210 Defendants next argue that the jury instructions were erroneous in several respects. As an initial matter, except where otherwise noted, defendants concede that they did not preserve their jury instruction claims because they did not object to the instructions or include the issues in their posttrial motions. See *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). Defendants nevertheless ask us to review their claims under the plain error doctrine or, alternatively, as a matter of ineffective assistance of counsel. Defendants also invoke

Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), which provides that "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." Relief under Rule 451(c) is coextensive with the plain error doctrine and is analyzed identically. *People v. Hartfield*, 2022 IL 126729, ¶ 49.

¶ 211 The plain error doctrine is an exception to the general forfeiture rules that allows a reviewing court to address an unpreserved claim of error where a clear or obvious error occurred. *Id.* ¶ 50. The doctrine has two prongs. *Id.* Under the first prong of the doctrine, the defendant must show that (1) a clear or obvious error occurred and (2) the evidence was "so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Id.* Under the second prong, the defendant must show that (1) a clear or obvious error occurred and (2) "the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.* An error in the jury instructions rises to the level of plain error only where it "creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *People v. Hopp*, 209 Ill. 2d 1, 8 (2004).

¶ 212 To establish ineffective assistance of counsel, a defendant must establish both that (1) his attorney's representation fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, the result of the proceeding would have been different. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000). A defendant will not succeed under either the plain error doctrine or a theory of ineffective assistance of counsel unless he first demonstrates that a clear or obvious error occurred. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 213                              1. Predicate Activity Instruction

¶ 214 We first address Dawson's and Lemon's claim that the trial court's "predicate activity" instruction was in error. Because this was the first RICO case tried in Illinois, the trial court did not have the benefit of Illinois Pattern Jury Instructions. The court therefore modeled its instructions after the Federal Criminal Jury Instructions of the Seventh Circuit and caselaw interpreting Racketeer Influenced and Corrupt Organizations Act (federal RICO statute) (18 U.S.C. §§ 1961 to 1968 (2012)). With respect to predicate activity, the trial court instructed the jury:

"To find a pattern of predicate activity, you must find beyond a reasonable doubt that a defendant agreed that some members of the conspiracy would commit at least three separate predicate acts. You must also find that those acts were in some way related to each other and that there was continuity between them.

\* \* \*

The State does not have to prove that any predicate acts were actually committed, or that a defendant agreed to personally commit any such acts, or that a defendant agreed that three or more specific acts would be committed."

¶ 215 Defendants contend that by using the phrase "a defendant," rather than "the defendant," the instructions allowed the jury to convict a particular defendant so long as it found *any* of the defendants agreed to the commission of three predicate acts. Defendants urge us to compare the instruction given in this case with the language of the Seventh Circuit's pattern instruction, which reads:

"In order to find a 'pattern of racketeering activity' for purposes of Count ___, you must find beyond a reasonable doubt that *the* defendant agreed that some member[s] of the conspiracy would commit at least two acts of racketeering as described in Count ___, [and

- 61 -

that they were separate acts]. You must also find that those acts were in some way related to each other and that there was continuity between them." (Emphasis added.) 7th Cir. Court of Appeals Pattern Jury Instructions, Criminal, at 834 (2023 ed.).[9]

¶ 216 We are unpersuaded by defendants' overly semantical argument, as we see no functional difference between the two sets of instructions. Read as a whole and in context, the instructions clearly asked the jury to decide whether each particular defendant agreed to the requisite number of predicate acts. For example, the jury was instructed that, to sustain the charge of racketeering conspiracy, the State was required to prove beyond a reasonable doubt that, among other things, "*each defendant* agreed with another person to the commission of the offense of racketeering, through a pattern on predicate activity" and that "*each defendant* did so with the intent that the offense of racketeering be committed." (Emphases added.). Thus, the instructions were clear that each defendant was required to have personally agreed to the predicate acts.

¶ 217 We also find no merit to defendants' assertion that the final paragraph of the predicate activity instruction confused the jury by "contradicting" or "negating" the first paragraph. In particular, defendants focus on the statement that "[t]he State does not have to prove *** that a defendant agreed that three or more specific acts would be committed." However, this language also mirrors the Seventh Circuit's pattern instructions, which state:

"For purposes of Count ___, the government does not have to prove *** that the defendant agreed that two or more specific acts would be committed." *Id.*

¶ 218 A fair reading of the instructions show that the key word is "specific." Like the Seventh Circuit's pattern instructions, the trial court's instructions in this case merely convey an accurate

_____

[9]Whereas Illinois's RICO statute requires three predicate acts, the federal RICO statute requires only two. 18 U.S.C. § 1961(5) (2012); 720 ILCS 5/33G-3(f)(1) (West 2012).

statement of the law; *i.e.*, it is sufficient for the State to prove that each defendant agreed to the commission of at least three predicate acts, and the State need not prove that any specific acts were among them. *Salinas*, 522 U.S. at 63 ("There is no requirement of some overt act or specific act in the [federal RICO] statute."); *United States v. Tello*, 687 F.3d 785, 792-93 (7th Cir. 2012) (rejecting argument that specific predicate act must be proven under the federal RICO statute).

¶ 219 The Seventh Circuit addressed essentially the same argument under the federal RICO statute in *United States v. Briseno*, 843 F.3d 264, 274-75 (7th Cir. 2016). There, the jury was instructed that " '[t]he government does not have to prove *** that the defendant agreed that two or more specific acts would be committed.' " (Emphases omitted.) *Id.* at 274. The defendant argued that this portion of the instructions was confusing and internally inconsistent with the requirement that the government prove he agreed to the commission of at least two predicate acts. *Id.* The Seventh Circuit rejected that argument, finding that the instructions aligned with their pattern instructions and accurately stated the law. *Id.* at 274-75. The court explained that, "[a]lthough the difference between 'at least two acts' and 'two or more specific acts' may be a fine one, it does exist." *Id.* at 275. We agree with the Seventh Circuit's analysis and therefore find no error in the court's predicate activity instruction. Because we find no error occurred, there can be no plain error. *Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 220                    2. Accountability Instruction

¶ 221 Dawson and Lemon also argue that the court erred in instructing the jury on accountability. Before reaching the merits of this argument, we note that the parties disagree as to whether the issue was preserved. Dawson and Lemon both assert that "the defense objected" to the accountability instruction, with Dawson also stating that the issue was included in his posttrial

motion. The State, on the other hand, maintains that defendants did not object or include the matter in their respective posttrial motions.

¶ 222    As the State points out, the record shows that only counsel for Odum and Davis objected to the instruction, and the only explanation given from either counsel was, "There's no evidence on Mr. Davis's behalf." Missing from the State's analysis, though, is that the trial court had previously informed all defense counsels that "there is a standing policy that everyone is adopting everyone else's arguments. So by way of their objecting, you are also objecting unless you opt out." Thus, the objections from Odum's and Davis's counsel also applied to Dawson and Lemon. However, despite the objection, the State is correct that defendants did not include the matter in their posttrial motions. Accordingly, the issue was not fully preserved. *Sebby*, 2017 IL 119445, ¶ 48 (both a contemporaneous objection and a posttrial motion are required to preserve an issue for review). With that said, we will analyze the issue for plain error. Regardless of forfeiture, we find no error.

¶ 223    In this case, the trial court gave the jury instruction on accountability patterned after Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016):

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

¶ 224    Dawson and Lemon do not contest that the instruction is an accurate statement of the law but rather contend that it was "inapplicable in a conspiracy case" and created a risk of the jury convicting them without having found that they personally agreed to the objects of the conspiracy.

¶ 225    This court's decision in *People v. Ulloa*, 2015 IL App (1st) 131632, upon which defendants heavily rely, helps illustrate the flaw in their argument. In *Ulloa*, the defendant was convicted of conspiring to deliver cocaine after the trial court gave a nonpattern instruction that the jury could find him guilty if they found that he " 'or one for whose conduct [he] is legally responsible' " agreed to the delivery of cocaine. *Id.* ¶ 20. We found this instruction to be plain error, as it misstated the law of conspiracy by suggesting that the defendant himself did not have to personally agree to the delivery. *Id.* ¶¶ 24-25.

¶ 226    Here, in contrast, the trial court did not erroneously inject the language of accountability into the conspiracy instructions. Rather, the court instructed the jurors that, to sustain the racketeering conspiracy charge, they had to find in part that "*each defendant agreed* with another person to the commission of the offense of racketeering." (Emphasis added.). Similarly, the jury was instructed that the criminal drug conspiracy charge required a finding that "*the defendant agreed* with others to the commission of the offenses of delivery of a controlled substance or possession of a controlled substance with the intent to deliver." (Emphasis added.). Thus, the jury could have only convicted a particular defendant if it found that that defendant personally agreed that the object of the conspiracy be committed. See *People v. Wilmington*, 2013 IL 112938, ¶ 49 (jury is presumed to follow the trial court's instructions).

¶ 227    Additionally, any error in giving the accountability instruction was harmless. The giving of an extraneous accountability instruction is harmless where there is sufficient evidence to prove that the defendant actually committed the offense as the principal. *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL App (1st) 093547-B, ¶ 85; *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 39. As we will explain more fully later in this opinion, there was ample evidence to find

defendants guilty of the charged conspiracy offenses. Any error was therefore harmless and did not rise to the level of plain error.

¶ 228                                    3. *Mens Rea* Requirement

¶ 229   Dawson next contends that the jury instructions on racketeering conspiracy erroneously omitted a description of the required *mens rea* in two ways, thus relieving the State of its burden of proof. First, he argues that the jury did not have to consider whether he *knowingly* served as a leader of the NLBS. Second, he argues that the instructions omitted the element that he *intentionally* participated in the operation or management of the NLBS.

¶ 230   Here, defendants were charged with racketeering conspiracy in violation of section 33G-4(a)(3) of the RICO statute, which provides:

> "(a) It is unlawful for any person, who *intentionally* participates in the operation or management of an enterprise, directly or indirectly, to:
>
> * * *
>
> (3) knowingly conspire to violate this Article." (Emphasis added.) 720 ILCS 5/33G-4(a)(3) (West 2012).

The statute limits those in the " '[o]peration or management' " of an enterprise to "any person who *knowingly* serves as a leader, organizer, operator, manager, director, supervisor, financier, advisor, recruiter, supplier, or enforcer of an enterprise in violation of this Article." (Emphasis added.) *Id.* § 5/33G-3(d).

¶ 231   With respect to Dawson's argument on "knowingly" serving as a leader, the court gave two relevant instructions, the "Racketeering Instruction" and the "Enterprise Instruction." The Racketeering Instruction informed the jury:

"A person commits the offense of racketeering when he, in the operation or management of an enterprise, serves as a leader *** for an enterprise and *knowingly* participates, directly or indirectly, in the operation or management of that enterprise through a pattern of predicate activity." (Emphasis added.).

The Enterprise Instruction provided, in relevant part:

"To participate in the operation or management of an enterprise, a person must direct or carry out the enterprise's affairs by *knowingly* serving as a leader, organizer, operator ***." (Emphasis added.).

¶ 232    Dawson concedes that the Enterprise Instruction properly defined the phrase "operation or management," including the *mens rea* requirement that the defendant knowingly serve as one of the enterprise's leaders, organizers, or the like. However, he contends that the Racketeering Instruction "conflicted" with the Enterprise Instruction and thus forced the jury to decide which to follow.

¶ 233    We disagree, as the two instructions must be read in tandem rather than in isolation. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). That is to say that the Racketeering Instruction provides that a person commits the offense of racketeering when he (1) knowingly participates in the operation or management of an enterprise (2) through a pattern of predicate activity. The Enterprise Instruction then immediately informed the jury that participating in the operation or management of an enterprise means "knowingly serving as a leader." Taken together, then, the two instructions required the jury to find, albeit somewhat redundantly, that Dawson knowingly participated by knowingly serving as a leader of the NLBS. In this way, the instructions do not conflict but actually complement each other, which only enforces the knowledge requirement. Thus, there is no error, let alone plain error.

¶ 234    As noted, Dawson also argues that the jury instructions allowed the jury to convict him of racketeering conspiracy without finding that he *intentionally* participated in the operation or management of the NLBS.

¶ 235    The trial court's instructions defined the offense of racketeering conspiracy as follows:

"A person commits the offense of racketeering conspiracy when he, with the intent to commit the offense of racketeering, agrees with others to participate in the operation or management of an enterprise, directly or indirectly, through a pattern of predicate activity, and an overt act in furtherance of the agreement is committed by him or by a coconspirator."

The trial court further instructed the jury that

"To sustain the charge of Racketeering Conspiracy, the State must prove each of the following propositions beyond a reasonable doubt:

First proposition: That the [NLBS] constituted an enterprise; and

Second proposition: That each defendant agreed with another person to the offense of racketeering, through a pattern of predicate activity, in that he knowingly conspired to participate, directly or indirectly, in the operation or management of the enterprise; and

Third Proposition: That each defendant did so with the intent that the offense of racketeering be committed; and

Fourth Proposition: That an overt act in furtherance of the agreement was committed by him or by a coconspirator, even if that person is not on trial before you."

Thus, the jury could not have convicted Dawson unless it found beyond a reasonable doubt that (1) he knowingly participated in the operation or management of the NLBS while (2) intending for the offense of racketeering to be committed.

¶ 236    Nevertheless, Dawson now argues that the instructions should have required the jury to find that he "knowingly conspired to intentionally participate, directly or indirectly, in the operation or management of the enterprise." We again reject Dawson's semantical argument. We see no difference between intending to engage in a racketeering conspiracy through an enterprise while knowingly participating in the leadership of that enterprise, on the one hand, and engaging in a racketeering conspiracy while intentionally participating in the enterprise through knowing leadership, on the other. Consequently, we find no error in the court's instructions.

¶ 237    Even if we were to find error, however, reversal would not be required. Our supreme court has explained that "an omitted jury instruction constitutes plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Hopp*, 209 Ill. 2d at 12. Erroneous or omitted instructions generally do not rise to the level of plain error when the evidence is overwhelming with respect to that element. See *People v. Jones*, 81 Ill. 2d 1, 10 (1979) (erroneous instruction on the element of intent was harmless where the defendant's intent was "blatantly evident"); *People v. Carter*, 405 Ill. App. 3d 246, 253 (2010) (instructional error harmless where "[t]he evidence on the issue of [the] defendant's intent was overwhelming"); *People v. Solis*, 216 Ill. App. 3d 11, 20 (1991) (instructional error harmless where evidence of the defendant's intent to kill was overwhelming).

¶ 238    Even assuming it is possible to unintentionally but knowingly participate as a leader of an enterprise, that is clearly not what happened in this case. As detailed above, the evidence of

Dawson's intentional (and knowing) participation was overwhelming. Indeed, he does not make any serious argument to the contrary. Thus, any error would have been harmless.

¶ 239                             4. Specific Unanimity Instruction

¶ 240    Dawson and Lemon next argue that the trial court erred by not giving a "specific unanimity instruction" stating that the jury could not convict them of racketeering conspiracy unless the jurors unanimously decided that defendants agreed to three specific predicate acts. However, defendants provide no support for this contention. Nor could they, as nothing in the RICO statute or caselaw warrants such an instruction. Rather, the statute provides that a defendant who intentionally participates in the operation or management of an enterprise is guilty of racketeering conspiracy so long as he knowingly agrees that at least three predicate acts be committed. 720 ILCS 5/33G-3(f)(1), 33G-4(a) (West 2012). Additionally, federal courts have routinely rejected defendants' argument in the context of the federal RICO statute. See, *e.g.*, *United States v. Rios*, 830 F.3d 403, 434 (6th Cir. 2016) ("[U]nanimity was not required as to the particular racketeering acts."); *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) ("To the extent Defendants argue that the district court was required to charge the jury that it had to unanimously agree on the specific racketeering acts that the conspirators engaged in during the conspiracy, such a claim cannot succeed."); *United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir. 2014) ("[T]o convict a defendant of RICO conspiracy, the jury need not be unanimous as to the specific predicate acts that the defendant agreed someone would commit.").

¶ 241    In the alternative, defendants argue that the trial court should have instructed the jury that it needed to unanimously agree on the "specific types" or "categories" of predicate acts involved in the racketeering conspiracy. This argument is slightly stronger but ultimately unavailing. Several federal decisions have held that the jury must be unanimous as to the types of predicate

acts that the defendant agreed would be committed. See, *e.g.*, *Wilson*, 579 F. App'x at 347. However, the statutory rationale for this holding is less than clear. The cases citing this point of law seemingly all trace back to the Tenth Circuit's decision in *United States v. Randall*, 661 F.3d 1291 (10th Cir. 2011). In *Randall*, the defendant was convicted of racketeering conspiracy after the trial court instructed the jury that its verdict " 'must be unanimous as to which type or types of predicate racketeering activity the defendant agreed would be committed; for example, at least two acts of drug trafficking.' " (Emphasis omitted.) *Id.* at 1296.

¶ 242    On appeal, the defendant raised a familiar argument—that the trial court erred by failing to instruct the jury that it had to be unanimous on the specific predicate acts that the defendant agreed would be committed. *Id.* The Tenth Circuit rejected that argument, siding with other federal courts holding that such a finding was not required for racketeering conspiracy. *Id.* at 1299. To conclude this point, the *Randall* court stated, "[W]e now join the circuits discussed above in concluding that for a charge of RICO conspiracy, a jury need only be unanimous as to the types of predicate racketeering acts that the defendant agreed to commit, not to the specific predicate acts themselves." *Id.* However, although all of the cases cited in *Randall* involved an instruction that the jury must be unanimous on the types of predicate activity, none of those cases explicitly held that such an instruction was required. Instead, those cases merely rejected the notion that a jury must be unanimous as to the specific predicate acts. See *United States v. Applins*, 637 F.3d 59, 82 (2d Cir. 2011) ("[W]e conclude that the district court's instruction was *sufficient* in requiring unanimity as to the types of predicate racketeering acts that the defendants agreed to commit without requiring a finding of specific predicate acts." (Emphasis added.)); *United States v. Hein*, 395 F. App'x 652, 656 (11th Cir. 2010) ("[The defendants'] argument that the jury had to unanimously agree on particular and individual acts and not just the general types of predicate

offenses is not supported by the law and thus was not required in a jury instruction."); *United States v. Glecier*, 923 F.2d 496, 499-501 (7th Cir. 1991) (rejecting the argument that an indictment for racketeering conspiracy needs to identify specific predicate acts).

¶ 243   Defendants acknowledge that the federal circuits are split on whether a "specific types" instruction is necessary in a racketeering conspiracy case. For instance, in *United States v. Schiro*, 679 F.3d 521, 533-34 (7th Cir. 2012), the Seventh Circuit noted the *Randall* line of cases but stated that it had its "doubts" that jury unanimity as to the specific types of predicate acts should be required. We are inclined to agree with the Seventh Circuit because—just as there is no basis in the statute to require unanimity as to specific predicate acts—there is also no basis in the statute to require unanimity as to specific types or categories of predicate acts. See *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 53 (Illinois courts "may afford a Seventh Circuit decision more persuasive value than [they] would the decisions of other federal courts, provided it is reasonable and logical.").

¶ 244   In any event, it remains true that "[w]hen a defendant fails to object to the trial court's general unanimity instruction, that instruction will usually suffice and no specific instruction will be needed." *United States v. Jackson*, 479 F.3d 485, 491 (7th Cir. 2007). Even in racketeering conspiracy cases, specific unanimity instructions "are necessary only when there is a significant risk that the jury would return a guilty verdict even if there were less than unanimity with regard to one or more elements of the crime." *Schiro*, 679 F.3d at 533. Defendants argue that such a significant risk exists here "[g]iven the legal and factual complexity of this six-week trial." While we do not dispute that the trial was a complex one, we disagree that the complexity created a risk of nonunanimity. Defendants place particular emphasis on the fact that the indictment "alleged 10 types of predicate crimes." However, the evidence at trial was narrowed to just three types of

predicate acts—murder, delivery of a controlled substance, and possession of a controlled substance with the intent to deliver. Thus, any risk of the jury not being unanimous as to which categories the three predicate acts came from is extremely low, especially because the jury specifically found that the predicate activity included two murders. Moreover, the evidence that defendants agreed to the commission of offenses in each of the three categories was overwhelming, which leaves us with no doubt that the jury was unanimous. *Id.* at 533-34 (holding that, even if the jury was required to be unanimous as to the types of predicate acts, the lack of a specific unanimity was harmless in the face of overwhelming evidence that the defendants agreed to all categories of predicate acts). Accordingly, defendants cannot establish plain error.

¶ 245                    G. "Reasonably Foreseeable" Murders

¶ 246   Defendants next raise several arguments related to section 33G-5(c) of the RICO statute, which authorizes additional penalties for reasonably foreseeable unlawful deaths that occur while a defendant is engaged in a racketeering violation. Specifically, the statute provides:

> "Wherever the unlawful death of any person or persons results as a necessary or natural consequence of any violation of this Article, the sentence imposed on the defendant shall include an enhanced term of imprisonment of at least 25 years up to natural life, in addition to any other penalty imposed by the court, provided:
>
> > (1) the death or deaths were reasonably foreseeable to the defendant to be sentenced; and
> >
> > (2) the death or deaths occurred when the defendant was otherwise engaged in the violation of this Article as a whole." 720 ILCS 5/33G-5(c) (West 2012).

¶ 247   Dawson first attacks the jury instructions regarding section 33G-5(c). Like most of his other jury instruction arguments discussed above, Dawson forfeited this issue by failing to object

in the trial court or raise the matter in his posttrial motion. Consequently, we review the matter for plain error.

¶ 248    Although the jury was given several instructions regarding section 33G-5(c), Dawson's argument focuses on the following:

> "To sustain the allegation made in connection with the offense of Racketeering conspiracy, the State must prove the following propositions:
>
> That during the commission of the offense of Racketeering conspiracy, (1) an unlawful death or deaths were reasonably foreseeable to particular defendants; and (2) that the unlawful death or deaths occurred while those particular defendants were otherwise engaged in the Racketeering conspiracy.
>
> If you find from your consideration of all the evidence that the above proposition has been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was proven.
>
> If you find from your consideration of all the evidence that the above proposition has not been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was not proven."

¶ 249    Dawson contends that the "singular language" of this instruction was somehow misleading or confusing to the jury. According to Dawson, the last two sentences of the instruction should have read "propositions" instead of "proposition." This change was necessary, he says, because the elements that (1) the unlawful deaths be reasonably foreseeable and (2) the deaths occurred while the defendant was engaged in a racketeering violation are two separate propositions that the State was required to prove. Dawson concludes that, by referring only to a single "proposition,"

the instructions could have misled the jury into subjecting him to the additional sentence if it found just one of the elements was proven.

¶ 250 We find no merit to this argument. The use of the word "and" in the instructions makes clear that the elements are conjunctive, *i.e.*, that the State was required to prove them both. Regardless, any risk of juror confusion was obviated by the verdict forms, which asked whether each element was proven separately. Thus, it is undisputable that the jury found both elements beyond a reasonable doubt.

¶ 251 Dawson further maintains that the instruction's language of "particular defendants" allowed the jury to find him eligible for punishment under section 33G-5(c) so long as it found that a death was reasonably foreseeable to any one of his codefendants and occurred while that codefendant was otherwise engaged in the racketeering conspiracy. This is essentially a rehashing of his argument with respect to the predicate activity instruction, and it fails for the same reason. Aside from the above-quoted instruction on section 33G-5(c), the jury was also instructed:

> "If you find a defendant guilty of racketeering conspiracy and determine whether certain predicate activity has been proved, you should then continue with your deliberations to decide whether the State has proved, beyond a reasonable doubt, that an unlawful death or deaths were reasonably foreseeable to *that defendant* and whether the unlawful death or deaths occurred while *that defendant* was otherwise engaged in the racketeering conspiracy." (Emphases added.).

This particularization is further reflected in the verdict forms. For instance, the forms for Dawson read:

> "Having found the defendant, CORNEL DAWSON, guilty of Racketeering Conspiracy, we, the jury, further find the following:

     c.     Regarding the June 24, 2002 unlawful death of Charles Watson:

The death was reasonably foreseeable *to CORNEL DAWSON*

\_\_\_ Not Proven

\_\_\_ Proven

AND

The death occurred *when CORNEL DAWSON* was otherwise engaged in the

Racketeering Conspiracy

\_\_\_ Not Proven

\_\_\_ Proven." (Emphases added.)

Thus, contrary to Dawson's assertions, the jury was required to consider whether the unlawful deaths were reasonably foreseeable to each specific defendant. We also note that the jury clearly understood that the question was individualized because it found that a different combination of deaths was reasonably foreseeable to each defendant. Thus, no error occurred.

¶ 252   Similarly, the record belies Dawson's claim that "the State was not held to its burden of proving beyond a reasonable doubt whether the murders were reasonably foreseeable to Dawson and occurred while he was committing RICO conspiracy." Dawson bases this argument on the fact that the verdict forms simply asked whether each element was "[p]roven," rather than proven beyond a reasonable doubt.

¶ 253   This argument is frivolous for several reasons. First, it is clear that "proven" referred to proof beyond a reasonable doubt because that was the only standard of proof on which the jury was instructed. Second, the reasonable foreseeability instructions explicitly mentioned proof beyond a reasonable doubt multiple times. For example, the jury was instructed:

"If you find from your consideration of all the evidence that the above proposition has been proved *beyond a reasonable doubt*, then you should sign the verdict form finding the allegation was proven.

If you find from your consideration of all the evidence that the above proposition has not been proved *beyond a reasonable doubt*, then you should sign the verdict form finding the allegation was not proven." (Emphases added.)

Additionally, the instructions stated:

"If you find that a defendant is guilty of racketeering conspiracy and determine whether certain predicate activity has been proven, you should then continue with your deliberations to decide whether the State has proved, *beyond a reasonable doubt*, that an unlawful death or deaths were reasonably foreseeable to that defendant and whether the unlawful death or deaths occurred while that defendant was otherwise engaged in racketeering conspiracy." (Emphasis added.)

Thus, Dawson is simply incorrect that the instructions did not hold the State to its burden of proof beyond a reasonable doubt.

¶ 254   Finally, Dawson asserts that the reasonable foreseeability instructions erroneously omitted the element that the unlawful death be a "necessary or natural consequence" of the racketeering conspiracy. The State maintains that the unlawful death being a necessary or natural consequence is not a separate element *per se* but is "subsumed" in the requirement that the death was reasonably foreseeable to the defendant.

¶ 255   We agree with the State. The "necessary or natural consequence" language is derived from *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946), where the United States Supreme Court held that a defendant may be convicted of a substantive offense committed by a coconspirator if

- 77 -

that offense (1) was done in furtherance of the conspiracy, (2) fell within the scope of the conspiracy, and (3) was "reasonably foresee[able] as a necessary or natural consequence of the unlawful agreement." Since *Pinkerton*, courts have equated whether an act was a necessary or natural consequence with whether it was reasonably foreseeable. See, *e.g.*, *United States v. Aurelhomme*, 598 F. App'x 645, 647-48 (11th Cir. 2015) (*per curiam*); *United States v. Rosalez*, 711 F.3d 1194, 1208-09 (10th Cir. 2013); *United States v. Ward*, 505 F. App'x 18, 22 (2nd Cir. 2012). Accordingly, the Seventh Circuit's pattern instruction on *Pinkerton* liability does not include the phrase "necessary or natural consequence" but provides that the government must prove the offense was "reasonably foreseeable" to the defendant. See 7th Cir. Court of Appeals Pattern Jury Instructions, Criminal, at 115-18 (2023 ed.). The same was true of the instructions in this case. The instructions (and verdict forms) required the jury to decide whether the State had proven that (1) the unlawful deaths were reasonably foreseeable to each defendant and (2) whether the deaths occurred while each defendant was otherwise engaged in the racketeering conspiracy. Thus, the instructions were proper.

¶ 256   Davis also contends that it was impermissible to sentence him to a life sentence under section 33G-5(c) "based on a finding of negligence," *i.e.*, reasonable foreseeability. Although Davis's argument is somewhat convoluted, the heart of his position appears to be that applying the concept of *Pinkerton* liability to murder is incompatible with principles of due process.

¶ 257   "*Pinkerton* liability is a type of vicarious liability that allows members of a conspiracy to be held liable for reasonably foreseeable substantive offenses committed by coconspirators in furtherance of the conspiracy." *United States v. Woods*, 14 F.4th 544, 552 (6th Cir. 2021). As many courts have recognized, *Pinkerton* liability is limited by due process, especially where the offense for which vicarious liability is imposed was not the original goal of the conspiracy. *United States*

*v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996). However, these due process limitations are generally not implicated where a defendant plays more than a minor role in the conspiracy. *United States v. Sleugh*, 827 F. App'x 645, 648 (9th Cir. 2020). Additionally, "a finding of foreseeability mitigates due process concerns that sometimes arise with *Pinkerton*'s vicarious liability." *United States v. Sanjar*, 876 F.3d 725, 743 (5th Cir. 2017).

¶ 258    Davis's argument relies almost entirely on the Tenth Circuit's decision in *United States v. Cherry*, 217 F.3d 811 (10th Cir. 2000). However, *Cherry* is not necessarily helpful to Davis. There, the court considered whether members of a conspiracy had waived their confrontation clause rights under the doctrine of forfeiture by wrongdoing where their coconspirator murdered a potential witness against them. *Id.* at 813. The court held that a defendant who did not directly procure a witness's unavailability could still be deemed to have waived his confrontation clause rights if (1) a coconspirator's procurement of the unavailability was within the scope of the conspiracy and (2) the procurement was reasonably foreseeable to the defendant. *Id.* at 820.

¶ 259    Despite that holding, in *dicta*, the *Cherry* court also stated that it had never extended the *Pinkerton* doctrine to a murder that was not the original object of the conspiracy because "first-degree murder liability incorporates a specific intent requirement far more stringent than mere foreseeability." *Id.* at 818. The court cautioned that "[t]o extend substantive *Pinkerton* liability [to murders that were not the original goal of a conspiracy] would apparently render every minor drug distribution co-conspirator, regardless of knowledge, the extent of the conspiracy, its history of violence, and like factors, liable for first-degree murder." *Id.*

¶ 260    However, *Cherry* explicitly did not hold that *Pinkerton* principles could not be applied to murder, an issue which the court recognized was "not before [it]." *Id.* Indeed, we are aware of no case (and Davis cites none) holding as much. Rather, many courts have upheld murder convictions

under *Pinkerton*, at least where the murders were reasonably foreseeable to the defendant. See, *e.g.*, *United States v. Gonzales*, 841 F.3d 339, 352 (5th Cir. 2016); *Rosalez*, 711 F.3d at 1207; *Mothersill*, 87 F.3d at 1219-20; *Ward*, 505 F. App'x at 22.

¶ 261    As these cases make clear, the relevant due process inquiry is focused on the defendant's connection to the murder. *United States v. Culberson*, 232 F.3d 897 (9th Cir. 2000) (table). Here, the jury found that the deaths of Snulligan and Taylor were reasonably foreseeable to Davis, a finding that was supported by sufficient evidence. In this regard, we note that Davis was a senior member of the NLBS and was well aware of the gang's history of violent retaliation.[10] Additionally, the evidence showed that Davis was among the various NLBS members in the parking lot at the time of Snulligan's murder, who Davis himself described as being "[a]ll at work." Davis was also connected to Taylor's murder, as he informed Dawson that the person "they" (younger NLBS members) killed was a rapper who was about to receive a signing bonus on his record deal. Accordingly, Davis's sentence comports with due process.

¶ 262                                     H. Sentencing

¶ 263                              1. Criminal Drug Conspiracy

¶ 264    Defendants next argue that their respective 40-year sentences for criminal drug conspiracy should be vacated because the jury did not find that they agreed to the possession of any "particular amount" of drugs, which was a factor that made defendants eligible for an extended sentence.

¶ 265    As relevant here, a person commits the offense of criminal drug conspiracy when he agrees with another to the commission of either (1) delivery of a controlled substance or (2) possession

---

[10]We also note that the *Cherry* court's concern about subjecting "every minor drug distribution co-conspirator" to *Pinkerton* liability is vitiated by the RICO statute, which applies only to those who participate in the operation or management of an enterprise. See *Cherry*, 217 F.3d at 818.

of a controlled substance with the intent to deliver. 720 ILCS 570/401, 405.1(a) (West 2012). The applicable sentencing range for criminal drug conspiracy depends on the type and quantity of drugs involved in the offense that the defendant agreed be committed. *Id.* § 405.1(c).

¶ 266   To this end, the court gave the pattern criminal drug conspiracy instruction modeled after Illinois Pattern Jury Instructions, Criminal, No. 17.32 (4th ed. 2000) that

"To sustain the charge of criminal drug conspiracy, the State must prove the following propositions:

First: That the defendant agreed with others to the commission of the offenses of delivery of a controlled substance or possession of a controlled substance with the intent to deliver; and

Second: That the defendant did so with the intent that the offenses of delivery of a controlled substance or possession of a controlled substance with the intent to deliver be committed; and

Third: That an act in furtherance of the agreement was performed by any party to the agreement.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 267   The verdict form first asked the jury to decide whether it found a particular defendant guilty or not guilty of criminal drug conspiracy. The form then stated:

"Having found the defendant, [defendant's name], guilty of Criminal Drug Conspiracy, we the jury, further find that the following acts in furtherance of the agreement have been proven to have been committed by the defendant, or by any coconspirator, as follows:"

Immediately under that, the jury was asked to decide whether six specific acts of possession with the intent to deliver were either "proven" or "not proven." For example, the verdict form stated:

"On or about June 13, 2013, through coconspirator SCOTT, 263.4 grams of heroin was possessed with the intent to deliver.

___ Not Proven

___ Proven."

¶ 268   The jury found that all six acts were "proven" as to each defendant. Based on Scott's possession of 263.4 grams of heroin, the trial court sentenced each defendant to 40 years in prison. See 720 ILCS 570/401(a)(1)(B) (West 2012) (possession of between 100 and 400 grams of heroin punishable by 9 to 40 years in prison).

¶ 269   Defendants maintain that the jury's verdict "established only that [they] had conspired to possess with intent to deliver some unspecified amount of cocaine or heroin." Defendants argue that the court could not impose an extended sentence without the jury making a finding on the specific quantity of drugs forming the object of the conspiracy.

¶ 270   We agree. In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond

a reasonable doubt." The offense of conspiring to possess heroin with the intent to deliver is generally punishable by a Class 2 felony sentence of three to seven years in prison. 720 ILCS 570/401(d), 405.1(c) (West 2012); 730 ILCS 5/5-4.5-35(a) (West 2012). However, the offense becomes punishable by up to 40 years in prison if the object of the conspiracy is to possess between 100 grams and 400 grams of heroin. 720 ILCS 570/401(a)(1)(B) (West 2012). Thus, the amount of drugs forming the object of the conspiracy is a fact that must be presented to the jury and proved beyond a reasonable doubt.

¶ 271 This point is illustrated by *Ulloa*, 2015 IL App (1st) 131632. There, the defendant was convicted of conspiring to deliver cocaine and sentenced to 20 years in prison. *Id.* ¶ 12. On appeal, we reversed the defendant's conviction based on errant jury instructions and thus did not reach the issue before us now. *Id.* ¶¶ 24-25. However, we chose to address matters that were likely to arise again on remand. *Id.* ¶ 27. In particular, we explained that, because the amount of cocaine determined the sentencing range, "the [trial] court must instruct the jurors that to find [the defendant] guilty as charged, they must find that *he agreed* to the delivery of more than 900 grams of a substance containing cocaine." (Emphasis added.) *Id.* (citing *Apprendi*, 530 U.S. at 490).

¶ 272 A review of the verdict forms in this case shows that the jury did not decide that defendants agreed to the possession of any particular amount of drugs. Rather, the jury was only asked to decide whether each defendant agreed to the possession of drugs *generally*. Although the jury also found that certain coconspirators actually possessed specific amounts of drugs with the intent to deliver, this is not the same as finding that the defendants agreed to those specific amounts. The jury's finding that those possessions in fact occurred satisfied criminal drug conspiracy's overt act requirement but was otherwise irrelevant to whether defendants were guilty of criminal drug

conspiracy. *People v. Edwards*, 337 Ill. App. 3d 912, 926-27 (2002) (criminal drug conspiracy does not require the completion of an underlying drug offense).

¶ 273   To be sure, a coconspirator's possession of a specific amount of heroin or cocaine may generally be strong circumstantial evidence that the conspiracy included those amounts. It may therefore be true that the jurors would have found that defendants agreed to the possession of those amounts had they been asked to do so. However, they were not, so defendants' sentences violate *Apprendi*.

¶ 274   Our analysis does not end there, as an *Apprendi* violation does not necessarily invalidate a defendant's sentence. *People v. Nitz*, 219 Ill. 2d 400, 409 (2006). After identifying an *Apprendi* violation, the next step is to determine whether the defendant raised a timely objection *Id.* at 409-10. If the defendant raised a timely objection, then we review the matter for harmless error. *Id.* If the defendant did not object, however, plain error analysis applies. *Id.* at 410. The difference is significant because it determines which party carries the burden of proof. *Id.* In harmless error analysis, the State must prove beyond a reasonable doubt that the result of the proceeding would have been the same had the error not occurred. *Id.* Under the plain error doctrine, however, it is the defendant who must persuade the court that the error was prejudicial. *Id.*

¶ 275   Here, as they appear to concede, none of the defendants objected to the *Apprendi* violation in the trial court. Thus, we review the matter for plain error. Within this framework, "a reviewing court must examine the evidence adduced at trial and determine objectively whether a rational jury would have made the finding in question." *Id.* at 414.

¶ 276   As noted, defendants were each sentenced to 40 years in prison for criminal drug conspiracy based on Scott's possession of over 100 grams of heroin. Under a plain error analysis, the question then becomes whether the evidence that defendants personally agreed to Scott's

possession of that amount was closely balanced. We conclude that it was. Although the evidence that defendants generally engaged in a far-reaching drug conspiracy was overwhelming, the evidence of Scott's involvement in that conspiracy was much weaker. The evidence with regard to Scott was essentially that (1) he repeatedly sold drugs in NLBS territory and (2) the police found 263.4 grams of heroin in his apartment when they arrived to execute his arrest warrant. Admittedly, there was evidence that defendants would not have allowed anyone who was not affiliated with the NLBS to sell drugs in their territory. However, the fact that the gang had to retaliate against those who encroached on their territory shows that it sometimes happened. Moreover, there was no evidence that any of the defendants communicated with or about Scott. Under these circumstances, we find that the evidence was at least closely balanced as to whether defendants' agreement included the possession by Scott. We therefore vacate defendants' sentence for criminal drug conspiracy.

¶ 277    Defendants contend that, because the jury did not find that they agreed to the possession of any particular amount of drugs, the matter should be remanded so that they can be resentenced to a Class 2 felony sentence of three to seven years. 720 ILCS 570/401(d) (West 2012) (possession of "any other amount" of a controlled substance with the intent to deliver is a Class 2 felony). We disagree. Although the evidence was closely balanced as to whether defendants agreed to Scott's possession, the same is not true for some other possessions that the jury found to have occurred. In particular, the jury found that Polk possessed 48.6 grams of cocaine with the intent to deliver, which was the amount found in his residence alongside various pieces of drug-dealing paraphernalia. In contrast to Scott, the evidence that Polk was involved in the conspiracy was overwhelming. The evidence showed that Polk, Dawson's half-brother, was not only a member of the NLBS but a "top runner" who distributed drugs to sellers and collected money from the sales.

He also frequently interacted with the other defendants in NLBS territory. Thus, the evidence that defendants agreed to Polk's possession of 48.6 grams of cocaine was not closely balanced. The sentencing range for a criminal drug conspiracy involving 48.6 grams of cocaine is 6 to 30 years. *Id.* §§ 401(a)(2)(A), 405.1(c). Accordingly, if a new trial is not necessary, defendants should be resentenced on remand to a sentence in that range.

¶ 278                                  a. Coconspirator "Instruction"

¶ 279   We briefly address Davis's argument that the structure of the verdict form for criminal drug conspiracy relieved the State of its burden of proving that certain individuals were coconspirators with defendants.

¶ 280   Initially, we note that the parties disagree on whether Davis forfeited this argument by failing to object in the trial court. The record shows that on the day after the jury instruction conference, Davis's counsel, Christopher Tinsley, stated the following:

> "MR. TINSLEY: I just wanted to put on the record before we finish very briefly, for the reasons stated today and yesterday, we still object to 1.01, 28.01, 28.02, 28.04, 33G4A definition and issues.
>
> THE COURT: Just a second. Why are you doing this? It was not—was it not all on the record yesterday? Do we need to have you summarize the record.
>
> MR. TINSLEY: It's going to take five seconds. I have four more words to say.
>
> THE COURT: Keep going.
>
> MR. TINSLEY: And racketeering definition and verdict forms.
>
> THE COURT: Okay. The record will so reflect."

¶ 281 Davis contends this reference to "verdict forms" was sufficient to preserve the matter before us. However, the records from "today and yesterday" show that counsel's objection was aimed at the instructions and verdict forms on racketeering conspiracy, not criminal drug conspiracy. Thus, the issue was forfeited. *Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion.").

¶ 282 Regardless of forfeiture, Davis's argument is meritless. He contends that asking the jury whether, for example, the State had proven that "[o]n or about June 13, 2013, through coconspirator POLK, 48.6 grams of cocaine was possessed with the intent to deliver" impermissibly presupposed that Polk was, in fact, a conspirator. Thus, Davis concludes that "the jurors had no choice but to find particular individuals were 'conspirators.' " We cannot make this leap of logic with Davis. If the jurors had found that a particular individual was not a conspirator, they could have simply answered that the State had not proven the given proposition. In any event, any error would have been harmless because, as discussed above, the evidence that Polk was a coconspirator was overwhelming.

¶ 283                          2. Racketeering Conspiracy Sentence

¶ 284 Finally, defendants argue that the trial court erred in sentencing them to life in prison for racketeering conspiracy. Defendants concede that they have forfeited this issue by failing to raise it in the trial court. However, they urge us to review the matter under the second prong of the plain error doctrine. We agree that an improper sentence, especially an improper life sentence, is a serious enough error to rise to the level of a structural error. *People v. Russell*, 2022 IL App (2d) 190733, ¶¶ 54-55 (erroneous imposition of extended sentence was second prong plain error). Accordingly, we will review the matter for plain error.

¶ 285                                      a. Section 33G-5(a)

¶ 286   The resolution of this issue requires us to construe the RICO statute, which presents a question of law we review *de novo*. *People v. Clark*, 2019 IL 122891, ¶ 17. "The primary objective of statutory construction is to ascertain and give effect to the true intent of the legislature." *Id.* ¶ 18. The best indicator of legislative intent is the language of the statute itself, given its plain and ordinary meaning. *Id.* ¶ 20. A court may also consider "the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Id.* If the language of a statute is clear and unambiguous, courts must apply it as written without the aid of other canons of statutory construction. *People v. Perry*, 224 Ill. 2d 312, 323 (2007).

¶ 287   Here, defendants were convicted of racketeering conspiracy in violation of section 33G-4(a)(3) of the RICO statute (720 ILCS 33G-4(a)(3) (West 2012)). Section 33G-5 of the statute, titled "Penalties," provides:

> "Any violation of subsection (a) of Section 33G-4 of this Article shall be sentenced as a Class X felony with a term of imprisonment of not less than 7 years and not more than 30 years, or the sentence applicable to the underlying predicate activity, whichever is higher ***." *Id.* § 33G-5(a).

Interpreting section 33G-5, the trial court sentenced defendants to life in prison based on the jury's finding that the predicate activity for each defendant's conviction included the murders of Snulligan and Taylor. See 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2012) (stating a defendant found guilty of more than one murder "shall" be sentenced to life in prison); 720 ILCS 5/33G-3(e) (West 2012) (defining "predicate activity" to include first degree murder).

¶ 288   Defendants, however, contend that the second clause of section 33G-5(a) is entirely inapplicable to racketeering conspiracy because "predicate acts" do not "underlie" a conspiracy. Defendants point out that the charge of racketeering conspiracy does not require the commission of any predicate acts. See *Tello*, 687 F.3d at 792. Defendants also argue that section 33G-4(e) of the RICO statute shows that racketeering conspiracies are associated with objects, rather than predicate acts. That section provides:

"Any person prosecuted under this Article may be convicted and sentenced either:

(1) for the offense of conspiring to violate this Article, and for any other particular offense or offenses that may be one of the objects of a conspiracy to violate this Article; or

(2) for the offense of violating this Article, and for any other particular offense or offenses that may constitute predicate activity underlying a violation of this Article." 720 ILCS 5/33G-4(e) (West 2012).

¶ 289   Section 33G-4(e) has little relevance to the issue before us, as it merely states that a defendant can be separately convicted (and sentenced) for both a racketeering violation and the offenses involved in that violation. Section 33G-4(e) does not say anything about how the sentence for a racketeering violation is determined. That information is contained in section 33G-5, the statute's only sentencing provision.

¶ 290   Under defendant's interpretation, a defendant convicted of racketeering conspiracy could never be sentenced to anything other than 7 to 30 years because predicate activity will never "underlie" a conspiracy charge. This is at odds with the plain language of section 33G-5, which by its terms applies to "[a]ny violation of subsection (a) of Section 33G-4." *Id.* § 33G-5(a). Had the legislature intended to carve out racketeering conspiracies from other violations of section 33G-

4(a), it would have said so. Additionally, while proof of the completion of predicate acts is not *required* for a racketeering conspiracy charge, there is no reason a racketeering conspiracy could not include the completion of predicate acts. Just as section 33G-5(c) punishes conspiracies that result in unlawful deaths more severely than those that do not, it is logical that the legislature intended to punish conspiracies that actually commit serious predicate crimes more harshly than those that never achieve their criminal goals. This is especially so where one of the legislature's stated goals in enacting the RICO statute was to address the "inadequate remedies, procedures and punishments" provided by existing criminal laws. *Id.* § 33G-2.

¶ 291 Moreover, defendant's construction of "underlying" does not conform with the plain meaning of the word. The Merriam-Webster Online Dictionary defines "underlying" in five ways: (1) "lying beneath or below"; (2) "BASIC, FUNDAMENTAL"; (3) "evident only on close inspection"; (4) "anterior and prior in claim"; and (5) "of or being present in deep structure." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/underlying (last visited April 24, 2024) [https://perma.cc/3QLN-BY9F]. None of these definitions support defendants' interpretation. Apparently recognizing this problem, defendants contend that the legislature used "underlying" according to what they say is its "settled *legal* meaning" whereby "[o]ne crime or conviction 'underlies' a second if it is logically necessary to the existence of the second, most frequently as an *element* of the second."

¶ 292 Defendants' overly narrow definition does not comport with the purpose of the RICO statute. It is also virtually identical to a construction that has been rejected by federal courts. See *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 35 (when construing Illinois statutes, Illinois courts may look to federal decisions interpreting similarly worded federal statutes). Like the Illinois statute, the federal RICO statute lists substantive racketeering violations and

racketeering conspiracy in the same section, section 1962 of Title 18 of the United States Code (18 U.S.C. § 1962 (2012)). The sentencing section of the federal statute in turn provides, "Whoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both ***." *Id.* § 1963(a).

¶ 293   In *United States v. Hernandez-Guevara*, No. 19-4679, 2021 WL 4316031, at *1 (4th Cir. Sept. 23, 2021), Hernandez-Guevara pled guilty to racketeering conspiracy and was sentenced to more than 24 years in prison. He challenged his sentence on appeal, interpreting the phrase "based on" as used in section 1963 to mean that the enhanced sentencing was triggered only when the underlying racketeering activity was an element of the racketeering violation. *Id.* Like defendants here, Hernandez-Guevara reasoned that the enhanced penalty would then never apply to racketeering conspiracy because the completion of the underlying racketeering activity is not an element of racketeering conspiracy. *Id.*

¶ 294   The Fourth Circuit rejected that construction, finding it inconsistent with the language of the statute. *Id.* at *2. In particular, the court concluded that "Hernandez-Guevara's interpretation effectively rewrites § 1963(a), which applies to a violation of '*any* provision of section 1962,' including RICO conspiracy under § 1962(d), thus rendering its introductory clause meaningless." (Emphasis in original.) *Id.* Additionally, as noted in *Hernandez-Guevara*, federal courts have routinely upheld sentences of greater than 20 years for racketeering conspiracy. See, *e.g.*, *Johnson v. United States*, 64 F.4th 715, 728-29 (6th Cir. 2023); *United States v. Farmer*, 38 F.4th 591, 604 (7th Cir. 2022); *United States v. Perez*, 21 F.4th 490, 493-94 (7th Cir. 2021); *United States v. Gomez*, 705 F.3d 68, 72 (2d Cir. 2013); *United States v. Martinez*, 657 F.3d 811, 816 (9th Cir. 2011); *United States v. Flores*, 572 F.3d 1254, 1268 (11th Cir. 2009) (*per curiam*). We are aware

of no federal case (and defendants cite none) holding that the sentencing enhancement of section 1963 does not apply to racketeering conspiracy.

¶ 295   In an attempt to distinguish these federal cases, defendants argue that the term "underlying" as used in the Illinois RICO statute is different than the "based on" language of the federal statute. We disagree. Contrary to defendants' assertions, nothing in the way the Criminal Code of 2012 uses "underlying" in other contexts remotely supports defendants' interpretation. Even if "underlying" was used in the way defendants suggest in those contexts, we are mindful that "identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute." *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion). It is clear from the context of the RICO statute that the legislature intended the sentencing enhancement of section 33G-5 to apply to racketeering conspiracy cases. Thus, there was no error.

¶ 296                              b. Double Enhancement

¶ 297   Finally, defendants argue that their additional life sentences for the reasonably foreseeable unlawful deaths of Snulligan and Taylor should be vacated where those murders were also used to establish the pattern of predicate activity on which the racketeering conspiracy was based.

¶ 298   Generally, a single factor cannot be used as both an element of an offense and as a basis for imposing a harsher sentence than would otherwise have been imposed. *People v. Powell*, 2012 IL App (1st) 102363, ¶ 8. This rule against so-called "double enhancements" is premised on the assumption that the legislature considered all factors inherent in the offense when determining the appropriate sentencing range for that offense. *People v. Guevara*, 216 Ill. 2d 533, 545 (2005). However, there is no prohibition against a double enhancement where the legislature clearly intended for one to exist. *Id.* at 545-46. In determining whether the legislature intended to allow a

double enhancement, we first look to the language of the statute itself. *People v. Phelps*, 211 Ill. 2d 1, 15 (2004). As with other issues of statutory construction, our review is *de novo*. *Guevara*, 216 Ill. 2d at 546.

¶ 299    After examining the language of the RICO statute, we determine that the legislature intended to allow the kind of double enhancement that occurred in this case. The stated purpose of the RICO statute was to remedy what the legislature viewed as "inadequate" punishments for street gangs and other criminal enterprises. 720 ILCS 5/33G-2 (West 2012). Against that backdrop, the legislature imposed the enhancement for reasonably foreseeable unlawful deaths "in addition to any other penalty imposed by the court," which may include up to life in prison for a racketeering violation. *Id.* § 33G-5(c). We also note that the definitions of both "predicate activity" and "unlawful death" explicitly include first degree murder. *Id.* § 33G-3(e), (g). Thus, the legislature must have contemplated that a murder could, at least separately, raise the penalty for racketeering activity and trigger the additional penalty for a foreseeable unlawful death. However, the legislature did not carve out an exception to the foreseeable death provision for cases in which the predicate activity included murder. Instead, the foreseeable death enhancement is applicable to "any violation" of the statute, regardless of what predicate activity was involved. *Id.* § 33G-5(c). As such, we conclude that the legislature intended to allow a murder to be used both as predicate activity and to trigger the additional sentence for reasonably foreseeable unlawful deaths. Accordingly, defendants' racketeering conspiracy sentences were not erroneous.

¶ 300                                    III. CONCLUSION

¶ 301    For the reasons stated, we remand the matter for further inquiry into juror 40's allegations of racial bias during deliberations. We also vacate defendants' sentences for criminal drug

conspiracy. Should a new trial prove unnecessary, defendants should be resentenced for criminal

drug conspiracy to a sentence of not less than 6 years but not more than 30 years.

¶ 302    Affirmed in part, vacated in part, and remanded.

Nos. 1-18-1491, 1-18-1818, 1-18-1819, and 1-18-1820 (cons.)

---

*People v. Spears*, 2024 IL App (1st) 181491

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-13349; the Hon. Michael B. McHale, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Alexander G. Muntges, Sarah Curry, and Daniel H. Regenscheit, of State Appellate Defender's Office, of Chicago, for appellants Duavon Spears, Cornel Dawson, and Clifton Lemon. |
| | Richard Dvorak, of Dvorak Law Offices, LLC, of Willowbrook, for other appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Iris G. Ferosie, and Sara McGann, Assistant State's Attorneys, of counsel), for the People. |